174 F.Supp.2d 1001 (2001)
UNITED STATES of America, Plaintiff,
v.
SANTEE SIOUX TRIBE OF NEBRASKA, a federally recognized Indian Tribe, Defendant.
No. 8:96CV367.
United States District Court, D. Nebraska.
December 7, 2001.
*1002 Laurie M. Barrett, Asistant United States Attorney, Omaha, NE, Paul D. Boeshart, Assistant United States Attorney, Lincoln, NE, for plaintiff.
Mark A. Weber, Walentine, O'Toole Law Firm, Dana C. Bradford, III, Bradford, Coenen Law Firm, Alan G. Stoler, Brent M. Bloom, Glenn A. Shapiro, Gallup, Schaefer Law Firm, Emil M. Fabian, III, Fabian, Thielen Law Firm, Mary C. Gryva, Frank, Gryva Law Firm, John M. Peebles, Maurice R. Johnson, Conly J. Schulte, Monteau, Peebles Law Firm, David R. Stickman, Federal Public Defender's Office, Deborah D. Cunningham, W. Russell Bowie, Michael A. Nelsen, Hillman, Forman Law Firm, Michael T. Levy, Omaha, NE, Scott Crowell, Monteau, Pebbles Law Firm, Kirkland, WA, for defendant.

MEMORANDUM AND ORDER
BATAILLON, District Judge.

INTRODUCTION
This matter is before the court following a hearing on the Santee Sioux Tribe's ("Tribe") request that this court lift the sanctions of civil contempt entered imposing fines on the Tribe for failure to comply with the court orders dated November 28, 1998, and June 25, 1999. The Tribe contends that because it has ceased operating all Class III gaming activities, it should no longer be held in contempt. The United States ("Government") opposes the motion contending that the Tribe is still operating Class III gaming devices. The court received evidence from both parties, including testimony from expert witnesses. After careful consideration of the arguments of each party, review of the exhibits and testimony, and thoroughly researching the relevant case law, I conclude that the Tribe's motion for relief, Fling No. 271, should be granted.

BACKGROUND
This action has a long history. I will summarize those parts that are relevant and important to my decision here. In early 1993, the Tribe attempted to negotiate with the State of Nebraska to create a compact with the State that would permit Class III gaming on tribal lands, pursuant to Indian Gaming Regulatory Act, 25 U.S.C. §§ 2701-2721 ("IGRA") and 18 U.S.C. §§ 1166-1168. No compact was reached, but the Tribe nevertheless opened a Class III gaming casino on the reservation in early 1996. Thereafter, the Chairman of the National Indian Gaming Commission ("NIGC") issued a closure order *1003 against the Tribe for the reason that the Tribe was participating in Class III gaming activities in violation of the IGRA. The Chairman ordered that the casino be closed by May 5, 1996. The Tribe complied with that order.
The Tribe appealed the Chairman's order to the full Commission. On June 28, 1996, the Tribe reopened its casino. The Government then filed suit against the Tribe asking the court to declare that the Tribe was operating an illegal Class III gaming casino, alleging violations of federal and state law, and requesting closure of the casino.
The court initially dismissed both the Tribe's request for injunctive relief and the Government's request for injunctive relief. On appeal the Eighth Circuit reversed. United States v. Santee Sioux Tribe of Nebraska, 135 F.3d 558 (8th Cir.1998). The court concluded that the Tribe had violated the IGRA by conducting a Class III gaming operation and further concluded that the district court erred in not issuing an injunction to prohibit the gambling operation.
On remand in November 1998, the district court ordered closure of all of the Class III gaming devices. The Tribe voted to continue operating the casino, and the Government moved for an order of contempt. Following a show cause hearing, the court found the Tribe in contempt and fined it $3,000.00 per day. In June 1999 the court increased the fines to $6,000.00 per day and entered judgment in the amount of $432,000.00, representing fines that had accrued to that date. In August 1999 and November 1999 the court determined that the individual members of the Tribe would not be held in contempt and that certain bank accounts could not be garnished. Thereafter, the Government garnished approximately $178,000.00 of the Tribe's money toward the judgment.
On appeal, the Eighth Circuit reversed the district court's decision not to hold the individual members of the Tribe in contempt and also reversed the district court's determination that certain monies in the bank account could not be garnished. United States v. Santee Sioux Tribe of Nebraska, 254 F.3d 728 (8th Cir.2001). Other findings by the district court relating to garnishment were affirmed by the Eighth Circuit. Id. The action was remanded. On September 20, 2000, this case was transferred to my docket. Filing No. 252.
On or about May 15, 2001, the Tribe ceased operation of its previous Class III gaming devices. It replaced the gaming devices with what is commonly known as "Lucky Tab II," in part because the evidence shows the NIGC's Chief of Staff wrote a letter to the Tribe's legal counsel suggesting that the Tribe install and operate the Lucky Tab II electronic pull-tab dispensers. Exhibit I. The NIGC thereafter dissolved its closure order. The NIGC takes the position that the Lucky Tab II is not a Class III gaming device. The Government, however, contends that the Lucky Tab II is a Class III gaming device.
On October 31, 2001, I held a hearing on the Tribe's motion. I received evidence and testimony, including testimony from expert witnesses. Thereafter, I allowed post-trial briefing by the Tribe concerning the patents set forth in Exhibits 112 and 113.[1]

*1004 ANALYSIS

A. Statutes

1. IGRA
Congress enacted the IGRA in 1988 to regulate gambling activities on Indian lands. 25 U.S.C. § 2702. The IGRA divides gaming into three separate categories: Class I, Class II, and Class III. Class I gaming activities are regulated by Indian tribes and are social games for minimal prizes. 25 U.S.C. § 2703(6) and § 2710(a)(1). Class I gaming activities are not at issue in this action. Class II gaming is defined as "the game of chance commonly known as bingo (whether or not electronic, computer, or other technologic aids are used in connection therewith) ... including (if played in the same location) pull-tabs, lotto, punch boards, tip jars, instant bingo, and other games similar to bingo...." 25 U.S.C. § 2703(7)(A). "Electronic or electromechanical facsimiles of any game of chance or slot machines of any kind" are excluded from the definition of Class II gaming devices. 25 U.S.C. § 2703(7)(B). The Government admits that the statute allows for use of an "electronic aid" in connection with a pull-tab machine. Class III gaming consists of "all forms of gaming that are not Class I or Class II gaming." 25 U.S.C. § 2703(8). The use of Class III gaming devices would require the Tribe to have a compact with the State of Nebraska. 25 U.S.C. § 2710(d)(1). Both the Government and the Tribe agree that no such compact exists.
The IGRA created the NIGC to establish rules and regulations in accordance with the statutory requirements. 25 U.S.C. §§ 2704, 2706(b)(10). The NIGC defines a permissible aid to a Class II device as "electronic, computer or other technologic aid" to Class II gaming as "a device such as computer, telephone, cable, television, satellite or bingo blower," that, when used: (a) "[i]s not a game of chance *1005 but merely assists a player or the playing of a game," and (b) "[i]s readily distinguishable from the playing of a game of chance on an electronic or electromechanical facsimile." 25 C.F.R. § 502.7.
The Government relies on the IGRA for its proposition that federal and state laws pertaining to gambling activities apply to Indian country to the same extent as they do elsewhere in a state. However, Class II gaming is expressly exempted from those provisions, unless there is a complete ban on gaming. 18 U.S.C. § 1166(c).
The Tribe contends that legislative history supports the use of technologic aids. The Senate Report accompanying the IGRA stated that "such technology would merely broaden the potential participation levels [in Class II gaming] and is readily distinguishable from the use of electronic facsimiles in which a single participant plays a game with or against a machine rather than with or against other players." Sen. Rep. No. 100-446 at 9, reprinted in 1988 U.S.C.C.A.N. 3079. The Senate report further states:
The Committee specifically rejects any inference that tribes should restrict Class II games to existing game sizes, levels of participation, or current technology. The Committee intends that tribes be given the opportunity to take advantage of modern methods of conducting Class II games and the language regarding technology is designed to provide maximum flexibility.
Id.

2. The Johnson Act
The Johnson Act governs the manufacture, sale, distribution and use of "gambling devices" on federal lands. 15 U.S.C. § 1171 et seq. The Johnson Act makes it unlawful to use gambling devices in Indian country. 15 U.S.C. § 1175(a). The Government contends that the Act applies here because the Tribe is operating a gambling device. The Tribe argues that the Act does not apply because the Lucky Tab II is a Class II device, and therefore, not subject to the Johnson Act.
The Government relies on Shoshone Bannock Tribes v. United States, No. CV95-0153-E-BLW (D.Idaho September 10, 1996), for its position that the Lucky Tab II is a Class III device and an illegal Johnson Act gambling device. In this case the magistrate determined the Lucky Tab II game was a Johnson Act device, a facsimile of the traditional game of pull-tab, and, consequently, a Class III gaming device. The district court affirmed these findings. However, a majority of cases have concluded that the Johnson Act is inapplicable to these types of devices, and similar findings have been made in both the Ninth and Tenth Circuits. United States v. 162 MegaMania Gambling Devices, 231 F.3d 713, 725 (10th Cir.2000) (Johnson Act does not prohibit Class II video bingo games); and United States v. 103 Electronic Gambling Devices, 223 F.3d 1091, 1101-02 (9th Cir.2000) (same); Cabazon Band of Mission Indians v. National Indian Gaming Comm'n, 827 F.Supp. 26, 31-32 (D.D.C.1993) ("Cabazon I"), aff'd, 14 F.3d 633 (D.C.Cir.1994) ("Cabazon II") (Johnson Act not applicable to aids to gambling).
Further, the legislative history supports the Tribe's argument.
The phrase "not otherwise prohibited by federal law" refers to gaming that utilizes mechanical devices as defined in 15 U.S.C. § 1175. That Section prohibits gambling devices on Indian lands but does not apply to devices used in connection with bingo and lotto. It is the Committee's intent that with the passage of this act no other federal statute, such as those listed below, will preclude the use of otherwise legal devices used *1006 solely in aid of or in conjunction with bingo or lotto or other such gaming on or off Indian lands. The committee specifically notes the following sections in connection with this paragraph:.... 15 U.S.C. § 1171-1178 [the Johnson Act].
Sen. Rep. No. 100-446 at 12, reprinted in 1988 U.S.C.C.A.N. at 3082.
I conclude that the Johnson Act is not applicable to Class II devices. It is clear that Congress intended to permit technological aids. Although the Government argues to the contrary, the clear weight of the case law shows that such argument has been rejected by a number of federal courts. See United States v. 162 MegaMania Gambling Devices, 231 F.3d at 725; United States v. 103 Electronic Gambling Devices, 223 F.3d at 1101-02; Diamond Game v. Reno, 230 F.3d 365, 367 (D.C.Cir.2000) (Diamond Game II); Cabazon II, 14 F.3d at 635; United States v. Burns, 725 F.Supp. 116, 124 (N.D.N.Y. 1989); Seneca Cayuga Tribe v. NIGC, Case No. 00-CV-609 (N.D.Okla. Feb. 20, 2001). I too conclude that the Johnson Act applies to Class III devices but not to Class II devices. Any other construction would nullify the IGRA. The essential determination, then, is whether the Lucky Tab II is a Class II or Class III device.

B. Caselaw  Class II and Class III Gaming
The Tribe relies on the decision of the D.C. Circuit in Diamond Game II to support its argument that the Lucky Tab II is a Class II aid, rather than a Class III device. The Government argued in that case that the Lucky Tab II device was a Class III gaming device. The court specifically found that Lucky Tab II aids in the game of pull-tabs. It further found that Lucky Tab II is not a "computerized version" of pull-tabs, but instead "the screen merely displays the contents of the paper pull-tab." Diamond Game II, 230 F.3d at 370. "It is, in other words, an aid to the game of pull-tabs." Id.[2]
The Government now argues that the Diamond Game II analysis is wrong, relying on cases that have determined that a pull-tab machine is a facsimile of a game of chance, and thus, a Class III gaming device. See Cabazon I, 827 F.Supp. at 32; Sycuan Band of Mission Indians v. Roache, 788 F.Supp. 1498 (S.D.Cal.1992), aff'd, 54 F.3d 535 (9th Cir.1994). The United States asserts that the test set forth in Cabazon II if applied to the Lucky Tab II shows it "`preserves the fundamental characteristics'" of the traditional paper pull-tab game, and therefore, it is a Class III device under IGRA. Cabazon II, 14 F.3d at 636 (quoting Sycuan Band of Mission Indians v. Roache, 788 F.Supp. at 1498). The court further held in Cabazon II that the game was a video version that "falls within the core meaning of electronic facsimile." 14 F.3d at 636 (quoting Cabazon I, 827 F.Supp. at 32). Likewise, the court in Sycuan Band held that "the machines present the player with `electronic facsimiles' of the pull-tab game." Sycuan Band of Mission Indians v. Roache, 54 F.3d at 542. However, because none of the cases relied on by the Government addresses the Lucky Tab II device, the Tribe argues that they are not squarely on point.
The Tribe also contends that in a meeting on February 13, 2001, with the Tribe and legal counsel for the Tribe and the United States Attorney present, the Chairman of the NIGC advised and encouraged the Tribe to use the Lucky Tab II device. Further, on April 2, 2001, NIGC Richard Schiff, acting Chief of Staff, sent a letter to Conly J. Schulte, counsel for the Tribe, *1007 stating: "We encourage the Tribe to take advantage of the judicial sanction given to Lucky Tab II or to seek out other machines that are identical to the Lucky Tab II in all material respects." Roger Trudell, Chairman of Tribe, Decl., Ex. A. Since the NIGC is the federal agency charged with implementing the IGRA, the Tribe contends that this endorsement should have legal effect. In addition, Donald Louden, a previous vice-president of sales and marketing at Worldwide Game Technology, the manufacturer of Lucky Tab II, through his declaration testified that the Chairman of the NIGC considers Lucky Tab II to be Class II gaming devices, and that at least twelve Indian tribes in several states use these electronic pull-tab devices. Ex. B.

C. Evidence  Expert Testimony
The crucial issue in this case is whether the Lucky Tab II is a technological aid to the game of pull-tabs (Class II) or whether it is a facsimile of the game of pull-tabs (Class III). The Government argues in essence that putting a Class II pull-tab into a machine makes it a facsimile of a game of chance. Based on the case law I have reviewed and the evidence submitted to me, I disagree. The evidence shows that the Lucky Tab II is not a completely self-contained game or a facsimile of a game of chance.
Barbara Ann Frederiksen testified as an expert for the Tribe. Ms. Frederiksen is a forensic software analyst. She has had significant specialized training, education, and experience in software analysis. She has had additional training and experience in bar coding scanning systems, and in particular worked on debugging, remediation, and programming. She is an expert in forensics, bar coding, and electromechanical devices.
Ms. Frederiksen testified at length about how the game of pull-tabs worked in this case. I will summarize her testimony because it weighs heavily in my decision in this case. Ms. Frederiksen testified that a player feeds money into the machine. No change is received. A start button is pressed and for approximately 2½ seconds an animated display appears. A pull-tab then comes out, is read by a bar code reader, and the video screen shows the money won by the player. There is no way for the machine to pay the player or to give credits. The player must go to the cashier to redeem the ticket. The machine only displays the winnings. A player cannot accumulate wins. The participant must present each pull-tab to get his or her winnings. The machine tells the player that he must go to the cashier for winnings. A machine dispenser cannot function without the pull-tabs in it. It will not accept money, nor will it display any symbols.
In terms of the machine's internal operations, there is a manual feed, a roll of paper pull-tabs, a bar code reader, a rubber roller, a cutter, and a cash drawer. The bar code reader reads the ticket as it passes through the machine. The machine gets a still image based on the bar code information. The computer chips do not determine win or loss. Only the back of the ticket determines the win or loss status. As the pull-tab leaves the machine, the bar code is read and an "image" is displayed on the screen. The image displayed depends on what is programmed into the bar code.
The pull-tabs themselves are preprinted. The pull-tabs indicate winners or losers, number manufactured, game type, and unique sequence number. The back of the pull-tab shows bar code information, which is an encrypted bar code with fifteen characters. The bar code must be scanned *1008 with a laser light to determine if there is a winner or a loser. The information is encrypted, so no one could figure out the result without the proprietary software from the manufacturer, World Gaming Technologies. Also, an anti-tampering device will reject a pull-tab that has already been read. In addition, the tabs must be dispensed in the correct sequence. The ticket always controls whether the player wins or loses, and the cashier is required to evaluate and read the pull-tab.
After describing the Lucky Tab II, Ms. Frederiksen offered her opinion that these devices are not facsimiles of a game of pull-tab. She further testified that these devices are, in her opinion, technological "aids" for the game.
On cross-examination Ms. Frederiksen testified that the sounds are different for a winning ticket versus a losing ticket. She further testified that each roll contained about 7,000 tickets and in a deal (defined as the total tickets in a particular batch) there would be approximately 540,000, with a predetermined number of winners.
Jerome L. Simpson, Jr., testified as an expert for the Government. Mr. Simpson had worked for 25 years for the FBI and then went into the accounting field. While with the FBI, he worked in the racketeering and records analysis division, and in particular examined evidence relating to gambling. A number of his investigations involved video gambling machines and gaming casinos. He stated that he testified about the Lucky Tab II device in Diamond Game Enterprises, Inc. v. Reno, 9 F.Supp.2d 13 (D.D.C.1998) (Diamond Game I) case, which was reversed by the Circuit in Diamond Game II. He has further testified that the Lucky Tab II is a Johnson Act device. However, he testified that he had never seen paper pull-tabs with bar-coded information before, and that he did no work with bar-code technology. Mr. Simpson testified that he observed players take the winning tickets, unopened, to the cashier for redemption. These players left the losing tickets, unopened, in the dispenser drawer.
He testified that these Lucky Tab II machines are very similar to slot machines. First, according to Mr. Simpson, the machines look alike in terms of size, video, lights, buttons, and illuminated buttons. They accept bills, have grids with similar symbols, make noises, and have similar payoffs. Players in both games can look at video screens to determine if they have won. Mr. Simpson thus concludes that the Lucky Tab II is a facsimile of a traditional slot machine.
On cross-examination Mr. Simpson admitted that he had no computer degree or training, was not published, and that his qualifications on some issues were called into question by Judge Michael Burrage in the Seneca-Cayuga Tribe case, at least with respect to the Johnson Act testimony.
After reviewing all of the evidence and relevant law in this case, I find that the Lucky Tab II machine is a technological aid to the game of pull-tabs, and thus is a Class II device. I base this conclusion on the following findings. First, the video does not determine the winner or loser. The player must pull the tab and take it to the cashier for validation. Second, theoretically, the game could be played without the machine. Third, no cash prizes are dispensed by the machine. Fourth, no credits are accumulated or prizes awarded by the machine. Fifth, the machine only dispenses paper pull-tabs. Sixth, there is no random generation performed by the machine. Seventh, the aid adds to the entertainment value. Eighth, the use of the machines in theory facilitates greater participation, since more participants are able to play at the same time. Ninth, *1009 these machines do not determine chance, and the player is not playing against the machine. Tenth, the machines are not an exact replica of pull-tabs. I found the testimony of Ms. Frederiksen and the Diamond Game II decision to be very persuasive in this regard.[3]

CONCLUSION
I find that Lucky Tab II is not an exact replica of the game of pull-tabs, and thus is not a facsimile of pull-tabs nor a Johnson Act device. I further find that Lucky Tab II is a Class II gaming device. In making this finding, I adopt the rationale set forth by the court in Diamond Game II. That court stated: "[T]he game played with the Lucky Tab II is not a facsimile of paper pull-tabs, it is paper pull-tabs." Diamond Game II, 230 F.3d at 370.
IT IS THEREFORE, ORDERED, ADJUDGED AND DECREED THAT:
1. The Tribe's motion for relief, Filing No. 271, should be and hereby is granted; and
2. All fines against the Tribe are hereby permanently suspended effective May 15, 2001.
NOTES
[1] The Government offered Exhibit 112, a certified copy of a patent allegedly relating to the devices in this case, and Exhibit 113, an internet copy of a patent allegedly related to the devices in this case. Both exhibits were received into evidence. However, since Exhibits 112 and 113 were not shared with counsel for the Tribe prior to this hearing, I allowed the Tribe to file a post-trial brief addressing the patent issues raised at the hearing. The Government argues that the language in both patents bolsters its contention that the Lucky Tab II is a game of chance intended to look like and to be a Class III gaming device. I am not convinced that Exhibit 112 is the correct patent for the Lucky Tab II in this case, nor am I sure that Exhibit 113 is a final copy of the patent in question. However, a thorough review of both Exhibits 112 and 113, if anything, supports the Tribe's view that the Lucky Tab II dispenser was considered to be a technologic aid to Class II gaming. The language in the exhibit, relied on by the Government, actually states that the device enables a play of a Class II game, "since the player does not rely upon the apparatus to determine the outcome of any particular play." Exhibit 113 at 18. Further, the patent states:

[E]ach player of the gaming apparatus, which [sic] playing this pull-tab game, will play against each other player, as opposed to the gaming apparatus itself. In a true Class III gaming apparatus, the player effectively plays against the apparatus in that some means associated with that apparatus will determine whether or not the player receives winning indicia.... In the present invention, the apparatus is actually passive, as opposed to active, and does not determine the fate or outcome of a particular game or play.
Ex. 113 at 17. The patent also states that the Lucky Tab II dispenser does not actually control the outcome of the game. Id. at 18. Likewise, in Exhibit 112, the patent describes the invention as a Class II game with the entertainment and enjoyment of a Class III game. Exhibit 112 at 2 and 5. The summary of the invention describes the device as an "electronic dispenser" much like that of an electronic ticket dispenser. Id. at 3.
Although some language in the patents discusses games of "chance" and the look of a Class III gaming device, my reading of Exhibits 112 and 113 indicates that the inventor intended that the Lucky Tab II device be a Class II gaming device. I agree with the Tribe that the Government relies on isolated comments from the exhibits to support its claims. Accordingly, I find that the patent Exhibits 112 and 113, even if relevant to this action, do not provide support for the Government's position.
[2] The Government did not appeal those findings to the Supreme Court.
[3] The Tribe argues that the Diamond Game II case requires the application of collateral estoppel in this case. The Government argues that collateral estoppel is not applicable, because this is a different tribe than the one in Diamond Game II. I need not decide this issue in view of my findings herein. I do note, however, that nonmutual collateral estoppel is not generally applied to the United States. See United States v. Mendoza, 464 U.S. 154, 158, 104 S.Ct. 568, 78 L.Ed.2d 379 (1984).