# United States Court of Appeals
## FOR THE EIGHTH CIRCUIT

_____

No. 02-1503

_____

| | | |
|---|---|---|
| United States of America, | * | |
| | * | |
| Appellant, | * | |
| | * | Appeal from the United States |
| v. | * | District Court for the District |
| | * | of Nebraska. |
| Santee Sioux Tribe of | * | |
| Nebraska, a Federally | * | |
| Recognized Indian Tribe, | * | |
| | * | |
| Appellee. | * | |

_____

Submitted: October 9, 2002

Filed: March 20, 2003 (Corrected March 25, 2003)

_____

Before MURPHY, BEAM, and MELLOY, Circuit Judges.

_____

BEAM, Circuit Judge.

The government appeals from the district court's[1] order granting the Santee Sioux Tribe (the Tribe) relief from a prior order of contempt. We affirm.

_____

[1]The Honorable Joseph F. Bataillon, United States District Judge for the District of Nebraska.

## I.	BACKGROUND

This is our third review of this case, which has an extensive factual and procedural history. In early 1993, the Tribe attempted to negotiate a compact with the State of Nebraska that would have permitted class III gaming on tribal lands, pursuant to the Indian Gaming Regulatory Act, 25 U.S.C. § 2701 et seq. (IGRA). No agreement was reached, but the Tribe nevertheless opened a class III gambling casino on the reservation in 1996. Thereafter, the Chairman of the National Indian Gaming Commission (NIGC) issued a closure order against the Tribe because the Tribe was illegally participating in class III gaming activities. The Chairman ordered the casino to close by May 5, 1996, and the Tribe complied with that order. However, on June 28, 1996, the Tribe reopened its casino.

The government then filed suit in federal court, alleging violations of federal and state law and requesting closure of the casino. The district court dismissed both the Tribe's and the government's request for injunctive relief. We reversed on appeal, holding that the Tribe had violated the IGRA by conducting class III gaming in contravention of Nebraska law and that injunctive relief was warranted. United States v. Santee Sioux Tribe of Neb., 135 F.3d 558, 564-65 (8th Cir. 1998) (Santee I).

On remand, the district court ordered removal of all class III gaming devices. Soon after, the Tribe voted to continue operating the casino, including the class III devices, and the government sought an order of contempt. The district court found the Tribe in contempt, and by November 1999, the district court had reduced to judgment accrued fines totaling in excess of $1 million. However, the district court determined that members of the Tribal Council could not be individually liable for contempt fines and that certain bank accounts could not be garnished. On appeal, we reversed the district court's decision not to hold the individual members of the Council in contempt and also reversed the district court's determination that certain

monies could not be garnished.  United States v. Santee Sioux Tribe of Neb., 254 F.3d 728, 735-37 (8th Cir. 2001) (Santee II).  Other findings by the district court relating to garnishment were affirmed, and the case was remanded.  Id. at 735, 738.

In May 2001, the Tribe ceased operation of its class III gaming devices.  It eventually replaced them with what is commonly known as "Lucky Tab II" machines, in part because the NIGC's Chief of Staff wrote a letter to the Tribe's legal counsel suggesting that the Tribe install and operate the Lucky Tab II dispensers.  The NIGC thereafter dissolved its closure order because it took the position that the Lucky Tab II is not a class III gaming device.  Accordingly, the Tribe brought this action, seeking relief from the prior order of contempt.  The government, however, contends that the Lucky Tab II is a class III device, or, in the alternative, that even if it is a class II device, it is prohibited by the Johnson Act, 15 U.S.C. § 1171 et seq.

At trial, the following evidence was adduced regarding the Lucky Tab II machines.  First, the instruments look and sound very much like traditional slot machines.  Internally, the device is essentially a computer.  It also has a manual feed for money, a roll of paper pull-tabs, a bar code reader to read the back of each pull-tab, a rubber roller to dispense the pull-tabs, a cutter which cuts the pull-tabs from the roll, and a cash drawer.  The bar code reader reads the pull-tab as it passes through the machine to the player, and based on this reading, a video screen displays the contents of the pull-tab–whether it is a winner or loser.  The machine also emits different sounds, depending on whether it has read a winning or losing ticket.

A player begins playing by feeding money into the machine, but the machine cannot give change.  The player presses a start button and after approximately two and a half seconds an animated display appears, announcing winner or loser status. The machine then dispenses the paper pull-tab to the player. At this point, the player can either pull back the paper tab to verify the contents, or continue playing by feeding more money into the machine and pressing the start button again.  If the pull-

tab is a winner, the machine cannot pay the player or give credits for accumulated wins; instead, the machine tells the player to go to the cashier and present the pull-tab to redeem winnings.

The pull-tabs themselves are small, preprinted, two-ply paper cards. The player peels off the top layer to reveal symbols and patterns which indicate a winning or losing card. The pull-tabs also indicate the number manufactured, game type, and unique sequence number. The back of the pull-tab shows an encrypted bar code with fifteen characters. The bar code must be scanned with a laser light to determine if the card is a winner or a loser. Because the information is encrypted, the data on the bar code is unknowable without the proprietary software from the manufacturer, World Gaming Technologies. Also, anti-tampering devices ensure that a pull-tab that has already been scanned will be rejected and that the tabs will be dispensed in the correct sequence. Without a roll of paper pull-tabs in place, the machine cannot function–it will not accept money or display any symbols.

The evidence suggested that, as a practical matter, players often take the winning tickets, unopened, to the cashier for redemption. Furthermore, players frequently leave the losing tickets, unopened, in the dispenser drawer of the Lucky Tab II machines.

The district court found that the machines at issue were class II devices because: the machines do not determine the winner or loser, pull-tabs can be played without these machines, the player does not play against the machine, and no winnings are paid or accumulated by the machines. The district court followed the reasoning in Diamond Game Enters., Inc. v. Reno, 230 F.3d 365 (D.C. Cir. 2000), in coming to this conclusion. United States v. Santee Sioux Tribe of Neb., 174 F. Supp. 2d 1001, 1008-09 (D. Neb. 2001).

## II.    DISCUSSION

In reviewing a district court's final judgment following a bench trial, we review factual findings for clear error and legal conclusions de novo.  Fed. R. Civ. P. 52(a); Tadlock v. Powell, 291 F.3d 541, 546 (8th Cir. 2002).  A district court's choice between two permissible views of evidence will not be clearly erroneous, and we must give weight to the district court's opportunity to judge the credibility of the witnesses.  Estate of Davis v. Delo, 115 F.3d 1388, 1393-94 (8th Cir. 1997).

The first issue in this case necessitates our delving into the relationship between the IGRA and the Johnson Act.  The government argues that if Lucky Tab II is construed to be a class II gaming device, it is still a "gambling device" within the parameters of the Johnson Act[2] and therefore prohibited.  If that is the case, the Tribe cannot be granted relief from the contempt order.  The Tribe argues that the Johnson Act defines "gambling device" so expansively that it would include any device which is "electric" or "mechanical," including those which are allowable class II gaming devices.  Because class II gaming is permitted under one federal law (the IGRA), but the machines which facilitate class II gaming are arguably prohibited under another (the Johnson Act), the Tribe argues that the IGRA has repealed the Johnson Act by implication.

---

[2]The Johnson Act defines "gambling device" to include all slot machines with a drum or reel with insignia, 15 U.S.C. § 1171(a)(1), and also:

> any other machine or mechanical device . . . designed and manufactured primarily for use in connection with gambling, and (A) which when operated may deliver, as the result of the application of an element of chance, any money or property, or (B) by the operation of which a person may become entitled to receive, as the result of the application of an element of chance, any money or property.

15 U.S.C. § 1171(a)(2).

The IGRA, in section 2710(b)(1)(A), states that an Indian tribe may engage in class II gaming where the state in which it is located permits similar games "and such gaming is not otherwise specifically prohibited on Indian lands by Federal law." 25 U.S.C. § 2710(b)(1)(A). This section, the government argues, shows that the two acts can be read together because the IGRA contemplated prohibition of certain class II games if the devices used to carry out the gaming are prohibited Johnson Act gambling devices.

We agree with the government that the two acts can be read together. First, it is well-established that repeals by implication are not favored. Morton v. Mancari, 417 U.S. 535, 549 (1974). "In the absence of some affirmative showing of an intention to repeal, the only permissible justification for a repeal by implication is when the earlier and later statutes are irreconcilable." Id. at 550. The two statutes here are not irreconcilable. Section 2710(b)(1)(A) clearly states that class II devices may be regulated by another federal statute–obviously the Johnson Act. Thus, the argument that the IGRA implicitly repeals the Johnson Act with respect to class II devices is not well taken, even though some version of this view has been expressed by several courts. See, e.g., United States v. 162 MegaMania Gambling Devices, 231 F.3d 713, 725 (10th Cir. 2000) (noting that the IGRA indicates Congress did not intend to allow the Johnson Act to reach class II devices); Diamond Game, 230 F.3d at 367 (finding that the IGRA limits "the Johnson Act prohibition to devices that are neither Class II games approved by the commission nor Class III games covered by tribal-state compacts"). But see Cabazon Band of Mission Indians v. Nat'l Indian Gaming Comm'n, 14 F.3d 633, 635 n.3 (D.C. Cir. 1994) (noting that besides express repeal of Johnson Act for class III gaming in IGRA section 2710(d)(6), "'[t]here is no other repeal of the Johnson Act, either expressed or by implication,'" for class III gaming) (quoting Cabazon Band Mission Indians v. Nat'l Indian Gaming Comm'n, 827 F. Supp. 26, 31 (D.D.C. 1993)). We find that the IGRA and the Johnson Act can be read together, are not irreconcilable, and the Tribe must not violate either act if it is to gain relief from the prior order of contempt.

The government argues that if the Johnson Act applies, the Lucky Tab II machines are prohibited "gambling devices" under that act, and the Tribe is still operating gambling equipment in contravention of federal law. We disagree because we do not believe the Lucky Tab II machines are "gambling devices" within the meaning of the Johnson Act. Lucky Tab II machines are not slot machines as apparently contemplated by 15 U.S.C. § 1171(a)(1), because they do not randomly generate patterns displayed on a screen, pay out money or otherwise determine the outcome of a game of chance. Nor do these machines fall within the strictures of sections 1171(a)(2)(A) and (B), which state, as earlier indicated, that a gambling device includes any machine:

> designed and manufactured primarily for use in connection with gambling, and (A) which when operated may deliver, as the result of the application of an element of chance, any money or property, or (B) by the operation of which a person may become entitled to receive, as the result of the application of an element of chance, any money or property.

15 U.S.C. § 1171(a)(2)(A), (B).

Lucky Tab II machines clearly do not fall within subsection A because the machines do not deliver any money or property. Subsection B seems a more likely candidate to ensnare these machines, but upon close examination, we find it does not. This section states that the operation of a machine designed and manufactured primarily for gambling use is a gambling device if, "**as the result of the application of an element of chance**" a person can be entitled to receive money or property. 15 U.S.C. § 1171(a)(2)(B) (emphasis added). The key words are highlighted, and demonstrate why the Lucky Tab II devices do not fit within this definition. As the trial testimony indicates, these machines do not generate random patterns with an element of chance. They simply distribute the pull-tab tickets and display the contents of the tickets on a screen for the user. The user of the machine does not become entitled to receive money or property as a result of the *machine's* application

of an element of chance, which is what the statute clearly contemplates. See id. ("by the operation of [the gambling device] a person may become entitled to receive, as the result of the application of an element of chance [by the machine], any money or property").

The Johnson Act does not bar this type of machine, because it is merely a high-tech dispenser of pull-tabs. If, however, the Lucky Tab II machines were computer-generated versions of the game of pull-tabs itself, or perhaps, even if it randomly chose which pull-tab from the roll it would dispense, it could fall within this subsection. However, it is clear the machines do neither of these things. Instead, they dispense, in identical order from the roll as physically placed in the machine, pull-tabs from that roll. The machines, as noted, have a cutting device which separate the tabs from the roll, and then feed the pull-tab to the player. This action does not describe the "application of the element of chance." Therefore, although we find that the IGRA does not repeal the Johnson Act, either explicitly or implicitly, we also find that the Tribe does not violate the Johnson Act by operating the Lucky Tab II machines.

However, this does not end the inquiry. Instead, the key question becomes whether Lucky Tab II is an IGRA-prohibited class III gaming device. We begin with the language of the law. The statute offers the following explanations of class II and class III gaming:

> **(7)(A)** The term "class II gaming" means–**(i)** the game of chance commonly known as bingo (whether or not electronic, computer, or other technologic aids are used in connection therewith)–

>> **(I)** which is played for prizes, including monetary prizes, with cards bearing numbers or other designations,

**(II)** in which the holder of the card covers such numbers or designations when objects, similarly numbered or designated, are drawn or electronically determined, and

**(III)** in which the game is won by the first person covering a previously designated arrangement of numbers or designations on such cards,

including (if played in the same location) pull-tabs, lotto, punch boards, tip jars, instant bingo, and other games similar to bingo . . . .

 **(B)** The term "class II gaming" does not include–**(i)** any banking card games, including baccarat, chemin de fer, or blackjack (21), or **(ii)** electronic or electromechanical facsimiles of any game of chance or slot machines of any kind.
. . .

(**8**) The term "class III gaming" means all forms of gaming that are not class I gaming or class II gaming.

25 U.S.C. § 2703(7), (8).

According to the statute, then, pull-tabs is a class II game. However, "electronic or electromechanical facsimiles of any game of chance" are not class II games. Such facsimiles constitute class III gaming. Id. The government argues that Lucky Tab II machines *are* electromechanical facsimiles of the game of pull-tabs, making their use prohibited class III gaming. The Tribe argues that these machines are technological "aids" within the meaning of section 2703(7)(A), and therefore fall within the parameters of permitted class II gaming. We do not fully agree with either of these positions, and in that regard, we pause to clarify a terminology issue.

Other courts have construed this statute and concluded that the phrase "whether or not electronic, computer, or other technologic aids are used in connection therewith" modifies both the game of bingo and also other games mentioned later in

the section, specifically "pull-tabs, lotto, punch boards, tip jars, instant bingo, and other games similar to bingo."  These courts thus have found that games other than bingo could be technologically aided.  E.g., Diamond Game, 230 F.3d at 367 (noting that pull-tabs is a class II game by statute, and that the IGRA specifically allows use of technologic aids "in connection with class II games").  We disagree with this reading of the statute.  Instead, we believe that the phrase "whether or not electronic, computer, or other technologic aids are used in connection therewith" applies only to bingo.  See 25 U.S.C. § 2703(7)(A).  However, we also note that nothing in the statute *proscribes* the use of technological aids for any games, so long as the resulting exercise falls short of being a facsimile.  Therefore, while we quarrel somewhat with the posture in which the parties, and other cases, have placed the issues, we agree with the ultimate conclusion that if the devices are not facsimiles within the meaning of the statute, they are not prohibited, regardless of whether or not they are labeled technological "aids."   With that caveat, we apply the "aids" and "facsimiles" terminology.

The District of Columbia Circuit recently considered whether the same Lucky Tab II machines at issue here were permitted class II gaming devices under the IGRA. The court distinguished the Lucky Tab II machines from the machines at issue in that circuit's earlier decision, Cabazon Band, 14 F.3d 633.  In Cabazon Band, the court examined electronic pull-tab machines which randomly selected a card for the player, electronically "pulled" the tab off the card at the player's direction, and displayed the results onscreen.   Because that game "exactly replicate[d]" the game of video pull-tabs in computer form, it was a facsimile and not a class II device.  Id. at 636.

The Diamond Game court observed that the Lucky Tab II machines were "quite different" from the machines in Cabazon.  230 F.3d at 369.  The court found that the presence of the video monitor did not render Lucky Tab II a computerized version of pull-tabs because the computer did not select the patterns; instead, the machines merely cut tabs from paper rolls, displayed and dispensed them.  "In other words, the

-10-

game is in the paper rolls, not, as in the case of the <u>Cabazon</u> machine, in a computer." <u>Id.</u> at 370. Furthermore, citing Webster's Dictionary for a definition of aid, the court found that the machines "'help[ed] or support[ed]' or 'assist[ed]' the paper game of pull-tabs." <u>Id.</u> (citing <u>Webster's Third New International Dictionary</u> 44 (1993)). Noting that a Lucky Tab II machine was "little more than a high-tech dealer," the <u>Diamond Game</u> court held that "Lucky Tab II is not a facsimile of paper pull-tabs, it *is* paper pull-tabs." 230 F.3d at 370 (emphasis in original).

The prior law of this case is also instructive on this question. In <u>Santee I</u>, the Tribe argued that the State of Nebraska, through its SLOTS keno reading system, was already conducting class III gaming. We rejected that argument and held that the SLOTS keno reading system was a class II gaming device because "[t]he 'SLOTS' device is only a means of allowing keno players to *view keno results*, and, unlike a slot machine, is not a means of conducting the game itself. *See* Opinion of Nebraska Attorney General at 11 (Sept. 18, 1995)." <u>Santee I</u>, 135 F.3d at 564 (emphasis added). The Nebraska Attorney General's opinion referred to by <u>Santee I</u> describes the SLOTS system as follows:

> This device allows players to view game results by pressing one or more buttons on a video display terminal. The game results are displayed in slot-machine like fashion with the use of symbols (cherries, bars, etc.) rather than the typical number display. In approving use of the system, the Department . . . concluded that the device merely displays the results of the game in a novel way and does not directly affect the outcome of the game.

Neb. Op. Att'y Gen. No. 95074, 1995 WL 551980, at *7 (Sept. 18, 1995) (internal quotations omitted).

The Lucky Tab II machines, much like the SLOTS system described in <u>Santee I</u>, "display[] the results of the game in a novel way and do[] not directly affect the

-11-

outcome of the game." Id. While the Lucky Tab II machines read the pull-tab card for the player and display the results on screen in a novel way, the paper pull-tab card itself is the player's only path to winning. The machines have nothing to do with the outcome of the game.

The Diamond Game court used a similar analysis to reach its conclusion about the Lucky Tab II machines. The government had offered a device called a "Tab Force Validation System" as an example of a class II aid. Under this system, a player buys a pull-tab from a clerk, and instead of peeling off the top layer, inserts the pull-tab into a scanner which reads a bar code and displays the results on a video screen. The Diamond Game court could find no discernable difference between the two systems:

> Both devices electronically "read" paper pull-tabs and display their contents on a screen, and neither can "change the outcome of the game." Unlike the machine involved in *Cabazon*, neither contains an internal computer that generates the game. Rather, both machines facilitate the playing of paper pull-tabs. They are thus Class II aids.

230 F.3d at 370.

While this case presents a close call, we think the better view is that operation of the Lucky Tab II machines does not change the fundamental fact that the player receives a traditional paper pull-tab from a machine, and whether he or she decides to pull the tab or not, must present that card to the cashier to redeem winnings. We agree with the reasoning of the Diamond Game court that the machines do not replicate pull-tabs; rather, the player using the machines *is playing* pull-tabs.[3]

---

[3]We have considered, and rejected, the government's argument that the Lucky Tab II machines are facsimiles of slot machines. These machines may look and sound like slot machines, but they cannot make change, accumulate credits, or pay out winnings. Thus, they are not exact copies (the commonly understood definition of a facsimile, see Cabazon Band, 14 F.3d at 636) of a slot machine.

The most recent amendments to the NIGC-enacted regulations also support this conclusion. Prior to July 2002, the regulations defined facsimile with direct reference to the Johnson Act. The regulation in effect as of July 17, 2002, defines "facsimile" as

> a game played in an electronic or electromechanical format that replicates a game of chance by incorporating all of the characteristics of the game, except when, for bingo, lotto, and other games similar to bingo, the electronic or electromechanical format broadens participation by allowing multiple players to play with or against each other rather than with or against a machine.

25 C.F.R. § 502.8 (July 17, 2002).[4]

Furthermore, the regulations effective July 17, 2002, define an "aid" as an electronic, computer, or other technologic device that assists the playing of a game. Id. § 502.7(a)(1). Significantly, the regulation gives the following examples of gaming aids, "*pull tab dispensers and/or readers*, telephones, cables, televisions,

---

[4]Citation to these newly-amended regulations begs the question of whether they can be applied in this case, as application would arguably impose an impermissible retroactive effect. See Criger v. Becton, 902 F.2d 1348, 1351 (8th Cir. 1990) (stating general rule of non-retroactive application for administrative regulations without indications to the contrary). However, the regulations were merely *amended*, not newly promulgated, and do not operate retroactively because they do not attach "new legal consequences to events completed before . . . enactment," Landgraf v. USI Film Prods., 511 U.S. 244, 270 (1994). Instead, the current regulations merely clarify the relevant terms. In fact, it appears the regulations were amended to conform with the reasoning in the four cases that analyzed this issue prior to promulgation of the amended regulations–162 MegaMania Gambling Devices, 231 F.3d 713, Diamond Game, 230 F.3d 365; United States v. 103 Elec. Gambling Devices, 223 F.3d 1091 (9th Cir. 2000), and Cabazon Band, 14 F.3d 633.

screens, satellites, bingo blowers, electronic player stations, or electronic cards for participants in bingo games." Id. § 502.7(c) (emphasis added).

The current regulations seem to expressly contemplate the use of Lucky Tab II pull-tab dispensers/readers, suggesting that the NIGC has now given its imprimatur to these types of machines. Cf. Diamond Game, 230 F.3d at 369 (noting at that time that the NIGC took no official position on the Lucky Tab II's class of gaming). Based on our review of the record and of the case law, the NIGC's conclusion that Lucky Tab II is a permissible class II gaming device seems to be a reasonable interpretation of the IGRA. Cf. Chevron U.S.A. Inc. v. Natural Res. Def. Council, Inc., 467 U.S. 837, 844 (1984) (holding that agency interpretation which is reasonable is entitled to deference).

## III.    CONCLUSION

Because we conclude that the Lucky Tab II machines are not prohibited Johnson Act gambling devices and are not prohibited "facsimiles" within the meaning of 25 U.S.C. § 2703(7), the Tribe is not conducting class III gaming in contravention of the federal court's prior order. We therefore affirm the judgment of the district court.

A true copy.

Attest:

CLERK, U.S. COURT OF APPEALS, EIGHTH CIRCUIT.

-14-