**F I L E D**
**United States Court of Appeals**
**Tenth Circuit**

**APR 17 2003**

**PATRICK FISHER**
**Clerk**

PUBLISH

## UNITED STATES COURT OF APPEALS

### TENTH CIRCUIT

---

SENECA-CAYUGA TRIBE OF
OKLAHOMA; FORT SILL APACHE
TRIBE OF OKLAHOMA;
NORTHERN ARAPAHO TRIBE OF
WYOMING; DIAMOND GAME
ENTERPRISES, INC.,

        Plaintiffs - Appellees,

v.

NATIONAL INDIAN GAMING
COMMISSION; JOHN ASHCROFT,
Attorney General of the United States;
UNITED STATES DEPARTMENT
OF JUSTICE; THOMAS SCOTT
WOODWARD, United States Attorney
for the Northern District of Oklahoma,

        Defendants - Appellants.

No. 01-5066

---

**APPEAL FROM THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF OKLAHOMA**
**(No. 00-CV-609-BU)**

---

Edward P. Lazarus (Sandra M. Lee and L. Rachel Helyar with him on the briefs),
Akin, Gump, Strauss, Hauer & Feld LLP, Los Angeles, California for Plaintiff-
Appellee, Diamond Game Enterprises, Inc.

Jess Green, Ada, Oklahoma, for Plaintiffs-Appellees Northern Arapaho Tribe of
Wyoming and Seneca-Cayuga Tribe of Oklahoma; (Andrew W. Baldwin, Lander,
Wyoming for Plaintiff-Appellee Northern Arapaho Tribe of Wyoming; Robert E.
Prince, Lawton, Oklahoma, for Plaintiff-Appellee Fort Sill Apache Tribe of
Oklahoma, with him on the briefs).

Vincent J. Falvo, Jr., United States Department of Justice, Washington, D.C.
(Frank J. Marine, Senior Litigation Counsel, Washington, D.C., David E.
O'Meila, United States Attorney, Northern District of Oklahoma, and Catherine
Depew, Assistant United States Attorney, Northern District of Oklahoma, with
him on the briefs), for Defendants-Appellants.

Stephen P. Collette, Long Beach, California, for Amici Curiae National Coalition Against Gambling Expansion, Stand Up For Kansas, and New Mexico Coalition Against Gambling.

Stephen B. Otto, Newport Beach, California, and Richard J. Wilson, Houston, Texas, for Amicus Curiae Cheyenne-Arapaho Gaming Commission.

---

Before **HENRY**, **McWILLIAMS**, and **LUCERO**, Circuit Judges.

---

**HENRY**, Circuit Judge.

---

This case requires us to interpret the Johnson Act, 15 U.S.C. §§ 1171-1178, and the Indian Gaming Regulatory Act ("IGRA"), 25 U.S.C. §§ 2701-2719. Appellants are the federal agencies and officials who threatened to prosecute three Native American tribes for use of a device called the Magical Irish Instant Bingo Dispenser System, which we will call "the Machine." Appellees are the three tribes, as well as the corporation that manufactured and supplied the Machine.

In response to the threat of prosecution, the appellees filed a complaint in federal district court. Subsequently, the district court granted the appellees' motion for a declaratory judgment stating that the Machine (1) is *not* an illegal "gambling device" under the Johnson Act; and (2) *is* a permissible technologic aid to Class II gaming under IGRA. This appeal followed.

Our opinion proceeds in four steps. Part I summarizes the applicable statutory framework. Part II summarizes the background of this dispute. Part III assesses, and rejects, the two threshold arguments raised by appellees: mootness and collateral estoppel. Part IV evaluates the district court's judgment on the

merits in two sections. The first section analyzes the relationship between IGRA and the Johnson Act and concludes that if the Machine is properly classified as an IGRA Class II technologic aid, then the Machine is necessarily both authorized by IGRA and protected from Johnson Act scrutiny. The second section, following the D.C. Circuit, concludes that the Machine is indeed an IGRA Class II technologic aid. Accordingly, although our reasoning differs somewhat from the district court, we affirm the district court's decision.

## I. THE STATUTORY FRAMEWORK

We begin by summarizing the applicable statutory framework. We discuss the Johnson Act and then IGRA.

The Johnson Act

The Johnson Act, as amended in 1962, makes criminal, both outside and inside "Indian country,"[1] the possession, use, sale, or transportation of any

---

[1] "Indian country" is a term of art. The United States Code defines "Indian country" as:

> (a) all land within the limits of any Indian reservation under the jurisdiction of the United States Government, notwithstanding the issuance of any patent, and, including rights- of-way running through the reservation;
> (b) all dependent Indian communities within the borders of the United States whether within the original or subsequently acquired territory thereof, and whether within or without the limits of a state, and
> (c) all Indian allotments, the Indian titles to which have not been extinguished, including rights-of-way running through the same.

18 U.S.C. § 1151. In contrast, "[t]here is no single statute that defines 'Indian' for all federal purposes." Felix H. Cohen's Handbook of Indian Law 23 (1982 ed.). Moreover, that term has been somewhat supplanted in recent years by the term "'Native American,' which has "become a part of the common parlance." Dawavendewa v. Salt River Project Agr. Imp. and Power Dist., 154 F.3d 1117, 1118 n.1 (9th Cir. 1998). We therefore strike a balance by using the statutory term "Indian country" to avoid confusion, but using the

"gambling device." 15 U.S.C. § 1175(a). The Johnson Act defines a "gambling device" as any

> slot machine . . . and other machine or mechanical device (including but not limited to, roulette wheels and similar devices) designed and manufactured primarily for use in connection with gambling, and (A) which when operated may deliver, as the result of the application of an element of chance, any money or property, or (B) by the operation of which a person may become entitled to receive, as the result of the application of an element of chance, any money or property.

Id. § 1171(a)(1), (2). Courts have construed the Johnson Act broadly, concluding that the statute's "gambling device" language was enacted to "anticipate the ingeniousness of gambling machine designers" in "separating the public from its money on a large scale," Lion Mfg. Corp. v. Kennedy, 330 F.2d 833, 836-37 (D.C. Cir. 1964), and therefore to cover a wide variety of machines. See James L. Rigelhaupt, Jr., What Constitutes Gambling Device Within Meaning of 15 U.S.C.A. Sec. 1171(a) So as to be Subject to Forfeiture Under Gambling Devices Act of 1962 (15 U.S.C.A. secs. 1171-1178), 83 A.L.R Fed. 177 (1987 & Supp. 2000) (collecting cases).

The Indian Gaming Regulation Act (IGRA)

Following the Supreme Court's decision in California v. Cabazon Band of Mission Indians, 480 U.S. 202 (1987), which "authorized gaming on federally recognized Indian country, Congress enacted the Indian Gaming Regulatory Act . . . also known as IGRA." United States v. 162 MegaMania Gambling Devices,

term "Native American" elsewhere in this opinion.

231 F.3d 713, 717 (10th Cir. 2000) (additional internal citations omitted). IGRA "provides a comprehensive regulatory framework for gaming activities on Indian country which seeks to balance the interests of tribal governments, the states, and the federal government." Pueblo of Santa Ana v. Kelly, 104 F.3d 1546, 1548 (10th Cir. 1997) (internal quotation marks omitted). Towards that end, IGRA authorized the creation within the United States Interior Department of a three member National Indian Gaming Commission. See 25 U.S.C. § 2704. The NIGC's broad powers include inspecting tribes' books and records, approving tribal-state pacts, levying and collecting civil fines, monitoring and shutting down unauthorized tribal games, and promulgating regulations and guidelines to implement IGRA. See 25 U.S.C. §§ 2705-06, 2713. IGRA divides Native American gaming into three mutually exclusive categories: Classes I, II, and III. 25 U.S.C. § 2703. The three classes differ as to the extent of federal, tribal, and state oversight. See United States Keetoowah Band of Cherokee Indians v. Oklahoma, 927 F.2d 1170, 1177 (10th Cir. 1991).

Class I

Class I gaming includes traditional Native American "social games played in connection with 'tribal ceremonies or celebrations.'" Id. (quoting 25 U.S.C. § 2703(6)). These traditional games include "'stick or bone' games, rodeos, and horse races played in conjunction with tribal celebrations, ceremonies, pow wows, or feasts."[2] Tribes possess *"exclusive jurisdiction"* to regulate Class I gaming.

---

[2] Edward P. Sullivan, Reshuffling the Deck: Proposed Amendments to the Indian Gaming Regulatory Act, 45 Syracuse L. Rev. 1107, 1126 (1995).

Keetoowah, 927 F.2d at 1177 (quoting 25 U.S.C. § 2710(a)(1)) (emphasis supplied).

Class II

Class II gaming includes "the game of chance commonly known as bingo (whether or not electronic, computer or other technologic aids are used in connection therewith) . . . including (if played in the same location) pull-tabs, lotto, punch boards, tip jars, instant bingo, and other games similar to bingo . . . ." 25 U.S.C. § 2703(7)(A). IGRA excludes from the definition of Class II gaming "electronic or electromechanical facsimiles of any game of chance or slot machines of any kind." Id. at § 2703(7)(B)(ii). Class II gaming may be conducted in Indian country without a tribal-state compact. See id. §§ 2703(7) & 2710(b)(1). Tribes may engage in, or license and regulate, Class II gaming on land within a given tribe's territorial boundaries if three conditions are met: (1) "such Indian gaming is located within a State that permits such gaming for any purpose by any person, organization or entity," (2) "such gaming is not otherwise specifically prohibited on Indian country by Federal law," and (3) "the governing body of the Indian tribe adopts an ordinance or resolution which is approved by the [Chairman of the NIGC]." Id. § 2710(b)(1)(A)-(B). Class II games are "*regulated by the [NIGC]*." MegaMania, 231 F.3d at 718 (citing 25 U.S.C. § 2710(b)) (emphasis supplied). Congress made no reference in IGRA to the relationship between the Johnson Act's strictures and IGRA's authorization of the use of technologic aids to Class II gaming. Nor has Congress amended the Johnson Act to clarify this relationship.

<u>Class III</u>

Class III is a residual category: under IGRA, all gaming activity other than Class I and II gaming is Class III gaming.  <u>Id.</u> § 2703(8).  Examples of Class III gaming include "any banking card games, including baccarat, chemin de fer, or blackjack (21)," and "electronic or electromechanical facsimiles of any game of chance or slot machines of any kind."  <u>Id.</u> § 2703(7)(B)(i)-(ii).  IGRA provides that the Johnson Act's prohibitions "shall not apply to any gaming conducted under a [t]ribal-[s]tate compact that" is entered into between "[a]ny Indian tribe having jurisdiction over the Indian lands upon which a Class III gaming activity is being conducted" in "a state in which gambling devices are legal."  <u>Id.</u> § 2710(d)(3), (6).  Class III gaming authorized by a tribal-state compact is regulated by the given compact.  However, Class III gaming not duly authorized may be subject to federal criminal prosecution under the Johnson Act.  Thus, regulation of Class III gaming is *shared by the tribes, the states, the NIGC, and the Department of Justice*.

## II.  BACKGROUND

**A.     Factual Background**

At the heart of this dispute is whether the game played with the Machine qualifies as the IGRA Class II game of pull-tabs.  Therefore, we first describe the game of pull-tabs as played in its traditional, manual form.  We then describe the game that is played with the Machine.[3]

---

[3] The factual background is drawn primarily from  paragraphs 16-23 of "Plaintiffs' Proposed Findings of Fact" as adopted by the district court, <u>see</u> Aplts' App. at 220, and from undisputed facts established at the preliminary injunction hearing, <u>see</u> Aplts' App. at

1.    Pull-tabs

In the game of pull-tabs as it is typically played, players compete against one another to obtain winning cards from a set of cards, known as a "deal."  A typical deal contains up to 100,000 cards and a predetermined number of winning cards.  Each individual pull-tab within a deal is a small, two-ply paper card.  When the top layer of an individual card is removed, the bottom layer reveals a pattern of symbols indicating whether the player has won a prize.  Winning cards are randomly spaced within preprinted, prearranged deals which are stored in boxes or divided into rolls.  One deal consists of all of the pull-tabs in a given game that could possibly be purchased.  A single game of pull-tabs is complete only when all pull-tabs within a given deal have been sold.

To participate in the game of pull-tabs, a player must purchase an individual tab from a clerk or dispenser.  The clerk or dispenser gives the next tab in the preprinted roll to the player.  The player must then open the tab to see if it contains a winning combination and present any winning tabs to a gaming hall clerk to obtain the corresponding prize.

2.    The Magical Irish Instant Bingo Dispenser System (The Machine)

The Machine is an electro-magnetic dispenser manufactured by plaintiff-appellee Diamond Game Enterprises.  Three physically separate components

---

15-209 (Hr'g on Plaintiffs' Mot. for Prelim. Injunction August 30, 2001).  Both parties failed to satisfy the requirement that they designate the adopted findings of fact as part of the appellate record.  See Fed. R. App. P. 30(a)(1)(B)-(C); 10th Cir. R. 30.1(A)(1) and 30.2(A)(1).  Nonetheless, because the adopted findings of fact are part of the ruling before us, we sua sponte designate them as part of the record on appeal.  See Fed. R. App. P. 10(e)(2)(C).

constitute the Machine – the dispenser, the base, and the verifier.  The Machine dispenses paper pull-tabs from a roll of a maximum of 7,500 tabs that are part of a larger pull-tab deal.  Other rolls within the same deal may be dispensed by another dispenser or a gaming hall clerk.

The Machine is mounted in front of fluorescent lights that illuminate the Machine.  When a player inserts money into the Machine and presses the button marked "DISPENSE," the Machine cuts the next pull-tab card from the pre-printed roll within its dispenser compartment and drops the tab into a tray for the player to receive.

The Machine has a "verify" feature that allows players to see the results for a given pull-tab posted on a video display.  When this feature is enabled, the Machine's display screen scans a bar code that has been previously printed on the back of a paper tab.  After the tab is dispensed, the screen displays the contents of the paper tab on a video screen approximately six seconds later.  The video screen depicts a grid that is similar in appearance to that of a slot machine.

Whether or not the "verify" function is enabled, any winning tabs dispensed by the Machine must be presented for in-person inspection by a gaming hall clerk before the player receives payment.  The clerk must confirm that the paper pull-tab contains a winning prize, and only then may the clerk award the appropriate (pecuniary) prize.

The game played with the Machine can be a high-stakes, high-speed affair.  A winning ticket pays up to $1,199.00 per one-dollar play.  When working properly, the Machine completes one play every seven seconds.

3.     The Tribes' Use of the Machine

Each of the three appellee tribes – the Seneca-Cayuga Tribe of Oklahoma, the Fort Sill Apache Tribe of Oklahoma, and the Northern Arapaho Tribe of Wyoming – is authorized by the NIGC to conduct gaming operations on its reservation.  Each tribe entered into leasing agreements with Diamond Game for use of the Machine, and at least one of the tribes, the Seneca-Cayuga Tribe, used the Machine as part of its gaming operations.

B.     **Procedural Background**

1.     The NIGC Advisory Opinion Letter and the Decision of the District Court for the District of Columbia in the Diamond Game case

In January 2000, the three tribes requested an administrative opinion from the NIGC regarding the classification of the Machine under IGRA.  The resulting advisory opinion concluded that the game played with the Machine constitutes unauthorized Class III gaming.

In the advisory opinion, the NIGC relied heavily on a decision by the United States District Court for the District of Columbia involving another dispenser made by Diamond Game, the "Lucky Tab II."  Like the Machine, the Lucky Tab II dispenses paper pull-tabs from a preprinted roll and displays the contents of the pull-tab on a video screen.  However, unlike the Machine, the Lucky Tab II does not permit the user to disable the "verify" feature and is one integrated physical unit.  On June 23, 1998, the United States District Court for the District of Columbia held that the Lucky Tab II is an IGRA Class III game not authorized for use by tribes in their gaming operations without specific compacts

between the tribes and the states in which their operations are located.[4] The NIGC's advisory opinion reasoned that the Lucky Tab II "closely parallels [the Machine]," and that the district court's opinion regarding the Lucky Tab II "provides clear guidance to determine the classification for the [Machine]."[5]

### 2. The Complaint

Following the issuance of the NIGC's opinion, the United States Attorney for the Northern District of Oklahoma threatened to bring an enforcement action against the three tribes for conducting unauthorized use of gambling devices in violation of the Johnson Act. In response to this threat of prosecution and the NIGC's advisory opinion, the tribes, joined by Diamond Game, filed the federal district court complaint in this case. The complaint sought two forms of relief: a declaratory judgment stating that the pull-tabs game as played with the Machine constitutes Class II gaming under IGRA and is not a "gambling device" proscribed by the Johnson Act; and an injunction preventing the federal authorities from taking the threatened enforcement action against the three tribes.

### 3. The District Court Hearing

On August 30, 2000, the district court conducted an evidentiary hearing, during which each side presented testimony from expert witnesses. During the hearing, the Machine and the Lucky Tab II were displayed. The government

---

[4] Diamond Game Enterprises, Inc. v. Reno, 9 F. Supp. 2d 13 (D.D.C. 1998).

[5] Aplts' App. at 11 (Letter from NIGC General Counsel Kevin Washburn, dated Feb. 29, 2000).

argued that the Machine is virtually identical to the Lucky Tab II and that both devices should be classified as Class III devices. In so arguing, the government asserted that "there is no[] . . . legal distinction or difference to be drawn" between the Machine and the Lucky Tab II, and that "fundamentally, the Machine and Lucky Tab II games are the same."[6]

### 4. The District Court's Rulings

The district court issued three rulings relevant to this appeal: an oral ruling on August 30, 2000, and two rulings on February 20, 2001, one oral, and one in writing.

### a. August 30, 2000 Oral Ruling

At the close of the evidentiary hearing, the district court made the following oral findings regarding the classification of the Machine under IGRA:

> The [Machine] is simply a dispenser of Pull-Tabs. It's not a Class II gaming device, nor a Johnson Act device. The [Machine] simply takes a deal, which is a roll of Pull-Tabs, which may be put in several rolls, and dispenses them at various locations. This deal could be played without the dispenser. In other words, somebody could sit at a ticket window and sell the Pull-Tabs individually. It wouldn't change the outcome of the game, whether they were sold over-the-counter or put out by the dispenser.
> The Pull-Tab tickets are predetermined at the time they are printed, outside the player's presence. When the Pull-Tab is purchased, the person purchasing the Pull-Tab is competing with all other persons in the deal. The Pull-Tab is printed before the game is ever played.
> The dispenser does not select the order of dispensing the Pull-Tab tickets, that is determined by where they are on the roll. The dispenser does not determine what is printed on the tickets. The dispenser does not accumulate

---

[6] Aples' Br. at 9 (quoting Defendants' Response to Mot. for Prelim. Injunction, at 10).

any winnings, it does not make change of any kind, it doesn't contain a random number generator; in other words, there is nothing inside the machine that determines who wins. *It's just a technologic aid to dispensing Pull-Tabs.* The winner is determined by the ticket being taken to a person, the person looking at the ticket, and then paying if the ticket is a winner.

There is no application of an element of chance in the machine, the dispenser doesn't do that at all. The dispenser doesn't determine who the winner is. That is predetermined when the Pull-Tabs are printed at some other location before the game is ever played.[7]

### b. February 20, 2001 Oral Ruling

On February 20, 2001, the district court made the following oral finding regarding the Johnson Act's applicability to the Machine:

[T]he Court finds that the [Machine] is not a Johnson Act [gambling] device. While the game of pull-tabs itself, by its nature contains an element of chance, no additional element of chance is applied by the [Machine]. The [Machine] merely dispenses preprinted prearranged pull-tabs and contains an additional optional monitor to help make the play of the game more enjoyable. The device cannot change the outcome of the game and a participant cannot win anything without first taking it to a cashier.[8]

However, in its oral ruling, the district court refused to issue a permanent injunction.[9]

### c. February 20, 2001 Judgment Order

On the same day, the district court entered its declaratory judgment that

---

[7] Aplts' App. at 176-77 (Evidentiary Hr'g dated August 30, 2000) (emphasis supplied).

[8] Aplts' App. at 221 (Evidentiary Hr'g dated Feb. 20, 2001).

[9] See Aplts' App. at 221-22.

"[t]he [Machine] is a permissible Class II aid under [IGRA] and that it is not a gam[bl]ing device under the Johnson Act."[10]  The instant appeal by the government ensued.  In the meantime, however, events relevant to this appeal had continued to unfold.

     5.     The D.C. Circuit Decision in the Diamond Game case
           and the Switch to Lucky Tab II

On November 3, 2000, the D.C. Circuit Court of Appeals held that the Lucky Tab II is an authorized IGRA Class II technologic aid, reversing the ruling by the United States District Court for the District of Columbia.[11]  In the wake of the D.C. Circuit's holding and the legal uncertainty surrounding this appeal, appellees stopped using the Machine and transitioned towards exclusive reliance on the Lucky Tab II.  By February 2002, none of the tribes were either using, or even still in possession of, a single Machine.  The tribes state that they have no present intention to use the Machine in the future, and that they have turned their attention from the Machine to the Lucky Tab II and other pull-tab devices.  Diamond Game states that it has ceased both manufacturing and providing the Machine to any tribes, and that, save one Machine it has retained for historical purposes, it no longer possesses any Machines.  The government does not dispute these statements.

### III. THRESHOLD ISSUES

Before turning to our evaluation of the merits of district court's rulings, we

_____

[10] Aplts' App. at 8 (Judgment of the District Court entered February 20, 2001).

[11] See Diamond Game Enterprises, Inc. v. Reno, 230 F.3d 365, 369-70 (D.C. Cir. 2000).

- 14 -

must first resolve two threshold issues raised by the appellees.

## A. Mootness

Having secured a victory in the D.C. Circuit, the appellees have moved to dismiss this appeal as moot and vacate the district court's declaratory judgment. The appellees argue that the case is moot because they "cannot be prosecuted" by the government.[12] The appellees' advocacy on this point may be somewhat half-hearted; at oral argument, counsel for two of the three appellee tribes urged us to reach the merits of this appeal. Nonetheless, because questions of mootness go to our jurisdiction, we are required to address this issue at the outset. City of Erie v. Pap's A.M., 529 U.S. 277, 287 (2000).

We review mootness questions *de novo*. Faustin v. City & County of Denver, 268 F.3d 942, 947 (10th Cir. 2001). "Constitutional mootness doctrine is grounded in the Article III requirement that federal courts [may] only decide actual, ongoing cases or controversies." Building and Constr. Dep't v. Rockwell Int'l. Corp., 7 F.3d 1487, 1491 (10th Cir. 1993) (internal citations and quotation marks omitted). However, "the conditions under which a suit will be found constitutionally moot are stringent." Id.

The current status of this appeal does not meet those stringent conditions. Because appellees retain a "legally cognizable interest in the outcome," id., the case is not moot. The appellees assert that their cessation of use of the Machine necessarily means that they can no longer be prosecuted under the Johnson Act. This assertion is incorrect. Affidavits submitted by the appellees establish that

---

[12]Aples' Mot. to Dismiss Appeal as Moot and Vacate District Court Decision, at 4 (filed Feb. 7, 2002).

the Machines were being supplied by Diamond Game to Native American tribes through at least November 2000, and were being used on certain of the appellee tribes' properties as recently as December 2001. The Johnson Act prohibits the possession, sale, transportation, or use of any gambling device in Indian country. 15 U.S.C. §§ 1175-76. The statute of limitations for Johnson Act prosecutions is five years. See 18 U.S.C. § 3282. Therefore, but for the legal impediment presented by the district court's February 20, 2001 declaratory judgment, the government would appear to have until at least 2006 to initiate a prosecution against the tribes, and until at least 2005 to prosecute Diamond Game.

Two additional factors counsel against dismissing the appeal as moot. First, it is not "*absolutely* clear that the allegedly wrongful behavior could not reasonably be expected to recur." S. Utah Wilderness Alliance v. Norton, 301 F.3d 1217, 1236 n.17 (10th Cir. 2002) (quoting Adarand Constructors, Inc. v. Slater, 528 U.S. 216, 222 (2000) (emphasis in original, internal quotation marks omitted)). Here, the plaintiffs / appellees shoulder the "heavy burden of persuading the court that the challenged conduct cannot reasonably be expected to start up again." Adarand, 528 U.S. at 222; see also City of Erie, 529 U.S at 287-88 (imposing this burden on the party that was the plaintiff below). As appellees concede, it is "technically possible" for the tribes to resume usage of the Machines. Aples' Mot. to Dismiss at 15. Indeed, Diamond Game nowhere represents that it would be unable to resume manufacturing and marketing the Machine; it is thus far from "absolutely clear" that the use, sale, possession, or transportation of the Machines under Diamond Game's proprietary control cannot be reasonably expected to recur. Accord United States v. Generix Drug Corp., 460 U.S. 453, 456 n.6 (1983) ("Respondent has argued that the case is moot

because almost its entire store of products containing the disputed active ingredients is no longer saleable, and in the future it intends only to sell [authorized] drugs . . . . The possibility that respondent may change its mind in the future is sufficient to preclude a finding of mootness.").

Second, we perceive a degree of strategic manipulation of the federal appellate courts by the appellees, who conceded in their supplemental briefs and at oral argument that the decision to reallocate resources from the Machine to the Lucky Tab II was driven by the D.C. Circuit decision issued during the pendency of this case. In City of Erie, the Supreme Court based its refusal to dismiss for mootness in part on a concern over strategic manipulation, concluding that the "interest in preventing litigants from attempting to manipulate [appellate] jurisdiction to insulate a favorable decision from review further counsels against a finding of mootness." 529 U.S. at 288. Appellees argue that City of Erie is distinguishable because the Supreme Court there, in declining to find mootness, specifically applied its reasoning to the Court's custom of leaving intact *state* court rulings that on appeal become moot. Appellees therefore urge us to follow the federal appellate court custom, for cases that become moot on appeal, of vacating the district court's judgment. See U.S. Bancorp Mortgage Co. v. Bonner Mall P'ship, 513 U.S. 18, 24-25 (1994). We, however, read City of Erie as expressing a generalized concern about manipulation of an appellate court's jurisdiction to seal a favorable decision from review. Here, appellees' conduct, while presumably not in bad faith, nonetheless implicates the concern over post-trial manipulation.

We thus conclude that the appeal is not moot.

- 17 -

**B.     Collateral Estoppel**

The second threshold issue we must resolve is whether, in the wake of the D.C. Circuit's <u>Diamond Game</u> decision, the government is barred by the doctrine of offensive collateral estoppel from arguing that the Machine is not an IGRA Class II technologic aid.  <u>See</u> Aples' Br. at 21-24 (citing <u>Diamond Game</u>, 270 F.3d at 370).  Offensive collateral estoppel describes claims such as those raised by the appellees, in which "'a plaintiff is seeking to [prevent] a defendant from relitigating the issues which the defendant previously litigated and lost against another plaintiff.'"  <u>Harvey v. United Transp. Union</u>, 878 F.2d 1235, 1243 n.13 (10th Cir. 1989) (quoting <u>Parklane Hosiery Co. v. Shore</u>, 439 U.S. 322, 329 (1979)).

An argument that the opposing party is estopped from litigating an issue must be timely raised.  <u>Arizona v. California</u>, 530 U.S. 392, 410 (2000).  We have previously applied this rule to bar a party from raising an estoppel argument on appeal where that party was a victorious plaintiff in the district court and failed to timely raise its estoppel claim below.  <u>See</u> <u>Harvey</u>, 878 F.2d at 1243 ("We hold that plaintiffs waived this issue preclusion claim by failing to invoke it timely.").

The D.C. Circuit's decision in favor of Diamond Game, a named plaintiff in both this and the D.C. Circuit case, was filed on November 3, 2000.  <u>See</u> <u>Diamond Game</u>, 230 F.3d at 365.  Thus, the D.C. Circuit's decision was issued well before the final hearing and February 20, 2001 judgment of the district court in this case.  Nonetheless, appellees never raised their estoppel claim in the district court, first raising the issue in their opening appellate brief filed April 30, 2002.

As we said in <u>Harvey</u>, "[t]his simply is too late."  878 F.2d at 1243.

- 18 -

Permitting such belated assertion of collateral estoppel arguments would "do[] nothing to vindicate two primary policies behind the doctrine, conserving judicial resources and protecting parties from 'the expense and vexation' of relitigating issues that another party previously has litigated and lost." Harvey, 878 F.2d at 1243 (quoting Montana v. United States, 440 U.S. 147, 153-54 (1979)). Accordingly, we hold that appellees have waived their estoppel argument. Although we do not reach the "merits" of the appellees' collateral estoppel argument, we note that nonmutual offensive collateral estoppel is generally not available against the federal government. See United States v. Mendoza, 464 U.S. 154, 159-62 (1984). We turn now to the merits of the government's appeal.

## IV. THE MERITS

### Standard of Review

We review the district court's interpretation of federal statutes and regulations *de novo*, MegaMania, 231 F.3d at 718, and its findings of fact for clear error. See Fed. R. Civ. P. 52(a). In addition, although the district court's order did not distinguish between gaming in Indian country and non-Indian country, we construe the order to apply only to use, sale, possession, or transportation of devices used in Indian country because the threatened prosecution at issue in this case only involved devices possessed or used by, or sold or transported to, the appellee tribes.

### Discussion

Our merits analysis divides into two sections. The first section analyzes the relationship between IGRA and the Johnson Act, specifically whether users of

IGRA Class II technologic aids in Indian country may be subject to Johnson Act liability. The second section analyzes whether the Machine is an IGRA Class II technologic aid.

**A. Whether Users of IGRA Class II Technologic Aids on Indian Country May be Subject to Johnson Act Liability**

### 1. Lack of Controlling Precedent

Appellees contend that it is "settled law" under this court's decision in MegaMania, 231 F.3d 713, that IGRA Class II technologic aids are insulated from the Johnson Act's ban on gambling devices. Aples' Br. at 16; Am. for Affirmance Br. at 7. That characterization is tempting because if accurate, it would considerably simplify our task. However, it overstates the case.

In MegaMania, we concluded that the "162 MegaMania" bingo game machine did not violate the Johnson Act. See 231 F.3d at 715. In reaching that conclusion, we first analyzed the question of how to classify the 162 MegaMania machine under IGRA and held that "MegaMania is not an electronic facsimile of, but is an aid to, the game of bingo." Id. at 725. "Accordingly," we stated, "MegaMania is *not excluded* from [IGRA]'s definition of a Class II game." Id. (emphasis supplied). We then stated in the sentence immediately following that "Congress did not intend the Johnson Act to apply if the game at issue fits within the definition of a Class II game [under IGRA], and is played with the use of an electronic aid." Id. The footnote accompanying that text stated that "our holding in this case . . . is limited to the MegaMania form of bingo currently at issue." Id. at 725 n.9.

The appellees argue that under MegaMania, technologic aids to *all*

- 20 -

enumerated Class II games beyond just bingo are insulated from the Johnson Act. However, as we have explained, we did not squarely reach that issue in MegaMania, nor have we done so in any subsequent decision. The lack of clear legislative or judicial resolution of the relationship between the Johnson Act and IGRA Class II technologic aids has engendered "'uncertainty . . . among the [] tribes, states, and regulatory bodies as to which games are properly classified as Class II under [IGRA] . . . . where tribes offer Class II games that utilize 'technologic aids' as IGRA expressly permits [*and*] . . . some of these games fall under the definition of 'gambling devices' under the Johnson Act.'"[13] *This* case, though, squarely presents the question of whether aids to those non-bingo games such as pull-tabs that are enumerated in 25 U.S.C. § 2703(7)(A) are protected from Johnson Act scrutiny, and we will address it.

### 2. Reading the Johnson Act in Light of IGRA

Our task is to interpret Congress's silence in the statutory text regarding the relationship between the Johnson Act and IGRA Class II technological aids. The prohibitions enacted in the 1962 amendments to the Johnson Act apply to all United States territories, including those in Indian country. See 15 U.S.C. § 1575. IGRA, enacted a quarter-century later, specifically excludes the Johnson Act from application to authorized Class III gaming, see 25 U.S.C. §§ 2710(d)(3), (6), but makes no statement one way or the other in the statutory text concerning the application of the Johnson Act to Class II technologic aids. Congress did not

---

[13] NIGC, Comments, Commissioners Elizabeth L. Homer and Teresa E. Poust, 67 Fed. Reg. 41,169 (June 17, 2002) (quoting Letter from the Chairman and Vice-Chairman of the United States Senate Committee on Indian Affairs to the NIGC (dated July 10, 2000)).

amend the Johnson Act at the time of the enactment of IGRA to clarify the extent to which the Johnson Act covers Class II gaming, nor has Congress done so since IGRA's enactment. Neither the parties' briefs nor our research have revealed any authority pre-dating the passage of IGRA that specifically addresses how the Johnson Act applied to the types of devices deemed by IGRA as Class II technologic aids.

In addition, no NIGC regulations exist on this issue to which we would owe any deference. Because the Johnson Act is a federal criminal statute enforced by the United States Department of Justice, we owe no deference to the NIGC's construction.[14] Moreover, even if we did defer to the NIGC on this issue, the NIGC has provided only limited guidance, issuing no amendments to the Code of Federal Regulations that address the relationship between the Johnson Act and IGRA Class II technologic aids. Although the individual commissioners did discuss the relationship between the Johnson Act and IGRA Class II aids in comments that accompanied amendments to the federal code of regulations, those comments were not included in the amended regulations, and they revealed that the commissioners remain divided on the issue.[15]

The government urges us to analyze whether, in the *absence* of IGRA, devices that fit within the ambit of authorized IGRA Class II technologic aids would violate the Johnson Act. However, contrary to the government's argument (and, apparently, to the district court's approach), the key inquiry is not how the

---

[14] See, e.g., Murphy Exploration & Prod. Co. v. Dept. of the Interior, 252 F.3d 473, 478 (D.C. Cir. 2001).

[15] Compare Comments of NIGC Commissioners Homer and Poust, 67 Fed. Reg. 41,166-72, with Comments of NIGC Commissioner Montie E. Deer, id. at 41,172-74.

Johnson Act would have applied to Class II gaming in Indian country independently of IGRA; instead, our view is that "[w]hat matters now is how the two are to be read together – that is, how two enactments by Congress over thirty-five years apart most comfortably coexist, giving each enacting Congress's legislation the greatest continuing effect."[16]

With that aspiration in mind, we note that under IGRA, Class II games include "the game of chance commonly known as bingo (whether or not electronic, computer or other technologic aids are used in connection therewith) . . . including (if played in the same location) *pull-tabs*, lotto, punch boards, tip jars, instant bingo, *and other games similar to bingo* . . . ." 25 U.S.C. § 2703(7)(A) (emphasis supplied). IGRA further provides that "electronic, computer, or other technologic aids" to such games are Class II gaming, and therefore permitted in Indian country. Id.

Absent clear evidence to the contrary, we will not ascribe to Congress the intent both to carefully craft through IGRA this protection afforded to users of Class II technologic aids and to simultaneously eviscerate those protections by exposing users of Class II technologic aids to Johnson Act liability for the very conduct authorized by IGRA.[17] A better reading of the statutory scheme is that

---

[16] United States v. 103 Electronic Gambling Devices, 223 F.3d 1091, 1101 (9th Cir. 2000).

[17] Accord Comments by NIGC Commissioners Homer and Poust, 67 Fed. Reg. 41,170 (June 17, 2002) ("[T]he Johnson Act has proven remarkably troublesome as a starting point in a game classification analysis."); id. at 41,168 ("The ingenuity of gaming designers, which was designed to be constrained by the Johnson Act, is arguably intended to be given freer reign by IGRA in the context of Class II gaming."). Cf. United Keetoowah, 927 F.2d at 1176 ("IGRA is a comprehensive and pervasive piece of legislation that in many respects preempts other federal laws that might apply to gaming.") (internal quotation marks omitted).

through IGRA, Congress specifically and affirmatively authorized the use of Class II technologic aids, subject to compliance with the other IGRA provisions that govern Class II gaming.

Moreover, by shielding Indian country users of IGRA Class II technologic aids from Johnson Act liability, this construction gives meaning to both statutes, rather than neutering one of legal import.[18]  This understanding of the two statutes recognizes that the Johnson Act may remain a tool for criminal prosecution of conduct outside Indian country or conduct within Indian country not authorized by federal law, but that through IGRA, Congress spoke *specifically* to the federal government's regulatory scheme over certain forms of authorized gambling within Indian country.

This common-sense reading of the two statutes is directly supported by legislative history.  The sole congressional committee report accompanying the passage of IGRA stated that

> [it] is the Committee's intent that with the passage of this act, no other Federal statute, such as those listed below [including "15 U.S.C. [§§] 1171-78," the Johnson Act] will preclude the use of otherwise legal devices used solely in aid of or in conjunction with bingo or lotto or other such gaming on or off Indian lands.

Indian Affairs Committee Report, S. Rep. No. 100-446 (1988), reprinted in 1988 U.S.C.C.A.N. 3071, 3082 ("Committee Report") (emphasis supplied).  Read in conjunction with Congress's inclusion in 25 U.S.C. § 2703(7)(A) of "pull-tabs" in a list of games "similar to bingo," this statement in the Committee Report is

---

[18] See FCC v. NextWave Personal Communications, Inc., 123 S. Ct. 832, 840 (2003) ("When two statutes are capable of coexistence, it is the duty of the courts, absent a clearly expressed congressional intention to the contrary, to regard each as effective.") (internal quotation marks omitted).

direct evidence that Congress did not intend the Johnson Act to apply to the use of Class II technologic aids in Indian country.  See Garcia v. United States, 469 U.S. 70, 76 (1984) ("[T]he authoritative source for finding the Legislature's intent lies in the Committee Reports on the bill, which represent the considered and collective understanding of those Congressmen involved in drafting and studying the proposed legislation.") (internal quotation marks omitted).[19]

This reading of Congress's intent is also supported by the goal identified in the enacted statutory text of providing a "a statutory basis for the operation of gaming by Indian tribes as a means of promoting tribal economic development, self-sufficiency, and strong tribal governments."  25 U.S.C. § 2702(1); see also Committee Report, 1988 U.S.C.C.A.N. at 3079 (declaring the legislative aim of fostering tribes' use of modern technology in branching out their Class II gaming operations, "thereby enhanc[ing] the[ir] potential of increasing revenues"); cf. Cabazon, 480 U.S. at 216 ("The inquiry is to proceed in light of traditional notions of Indian sovereignty and the congressional goal of Indian self-governance, including its overriding goal of encouraging tribal self-sufficiency and economic development") (internal quotation marks omitted).

---

[19] See also United States v. Nelson, 277 F.3d 164, 186 (2d Cir. 2002) ("In making this inquiry, we rely principally on the reports of the legislative Committees involved in drafting the statute and in steering it through Congress [and] . . . . eschew reliance on the passing comments of one Member, and casual statements from the floor debates"), cert. denied, 123 S. Ct. 145; In re Kelly 841 F.2d 908, 912 n.3 (9th Cir. 1988) ("[O]fficial committee reports [] provide the authoritative expression of legislative intent."); Mills v. United States, 713 F.2d 1249, 1252 (7th Cir. 1983) ("Committee reports represent the most persuasive indicia of Congressional intent (with the exception, of course, of the [statute's] language."); William N. Eskridge, Jr., Philip P. Frickey, & Elizabeth Garrett, Cases and Materials on Legislation: Statutes and the Creation of Public Policy 947 (3d ed. 2001) ("Most judges and scholars agree that committee reports should be considered as authoritative legislative history and should be given great weight.").

The understanding that Congress intended to insulate Class II technologic aids from Johnson Act liability is consistent with our statement in MegaMania that "Congress did not intend the Johnson Act to apply if the game at issue fits within the definition of a Class II game [under IGRA], and is played with the use of an electronic aid," 231 F.3d at 725, and with the D.C. Circuit's statement in Diamond Game that IGRA limits "the Johnson Act prohibition to devices that are neither Class II games approved by the [NIGC] nor Class III games covered by tribal-state compacts." 230 F.3d at 367.[20] Further, and somewhat ironically, this understanding is *also* consistent with the most recently expressed view of the NIGC,[21] and even with that of certain attorneys in the Department of Justice.[22]

_____

[20] See also United States v. Burns, 725 F. Supp. 116, 124 (N.D.N.Y. 1989) (concluding that "Congress intended that no federal statute should prohibit the use of gambling devices for bingo or lotto, which are legal class II games," that "IGRA makes 15 U.S.C. § 1175, and other statutes . . . inapplicable to class II bingo," and that IGRA's legislative history "indicates not that [such statutes are] preempted by the IGRA, but in fact that [they] remain in effect, except for [] potential application to class II gaming"), aff'd sub nom, United States v. Cook, 922 F.2d 1026 (2d Cir. 1991). Cf. United States v. 103 Electronic Gambling Devices, 223 F.3d at 1101 (the Ninth Circuit concluding that "IGRA quite explicitly indicates that Congress did not intend to allow the Johnson Act to reach [Class II] bingo aids."). But see United States v. Santee Sioux Tribe of Nebraska No. 02-1503, 2003 WL 1339280, at *3 (8th Cir. Mar. 20, 2003) (stating that "the argument that the IGRA implicitly repeals the Johnson Act with respect to class II devices is not well taken, even though some version of this view has been expressed by several courts," and concluding that "the Tribe must not violate either act"); Cabazon Band of Mission Indians v. Nat'l Indian Gaming Comm'n, 14 F.3d 633, 635 n.3 (D.C. Cir. 1994) (stating that besides express repeal of Johnson Act for Class III gaming in IGRA section 2710(d)(6), "'[t]here is no other repeal of the Johnson Act, either expressed or by implication,'" for Class III gaming) (internal quotation omitted); Cabazon Band Mission Indians v. Nat'l Indian Gaming Comm'n, 827 F.Supp. 26, 31 (D.D.C. 1993) (same).

[21] NIGC, Comments by NIGC Commissioners Homer and Poust, 67 Fed. Reg. 41,169 (June 17, 2002) ("Congress did not intend the Johnson Act to apply if the game at issue fits within the definition of a Class II game, and is played with the use of an electronic aid.") (quoting MegaMania, 231 F.3d at 725); NIGC, Comments, 67 Fed. Reg. at 41,170 ("Because Congress intended to permit the use of electronic technology in Class II gaming (even if the device might otherwise fall within the ambit of the Johnson Act), the important factor in a game classification analysis is whether the technology is assisting a player or the play of the game."); id. at 41,168 ("The traditional broad construction of the

Against these authorities, the government advances essentially two related arguments, neither of which is convincing. The government's first and more forceful argument draws on the maxim of statutory construction *expressio unius est exclusio alterius,* which "means inclusion of one thing indicates exclusion of the other."[23] In this context, "the notion is one of negative implication: the enumeration of certain things in a statute suggests that the legislature had no intent of including things not listed or embraced."[24] The government points to the statement in IGRA that the Johnson Act "shall not apply to any gaming conducted under a Tribal-State compact" that is entered into between "any Indian Tribe having jurisdiction over the Indian country upon which a *Class III* gaming activity is being conducted" and "a state in which gambling devices are illegal," 25 U.S.C. § 2710(d)(3), (6) (emphasis supplied). Because the quoted language is the only express exception provided for in IGRA to the general applicability of the Johnson Act, contends the government, "[t]he necessary corollary to that express exception . . . is that, where there is no such compact, 'gambling devices' may not be used in Indian country."[25]

---

Johnson Act encompasses numerous devices manufactured that the Commission now believes Congress presumed to constitute acceptable technologic aids.").

[22] See, e.g., Memorandum from Richard Shiffrin, Deputy Assistant Attorney General, to Seth P. Waxman, Associate Deputy Attorney General (June 13, 1996) (reviewing IGRA's legislative history and concluding that "Congress did not intend for [the Johnson Act] to bar the use of [certain] technologic [gaming] aids on Indian lands when operated in compliance with the Class II provisions of IGRA") (taking a position since disavowed by the Department of Justice) (cited with approval in Diamond Game, 230 F.3d at 368).

[23] Eskridge, Frickey, and Garrett, *supra* n.19, at 824.

[24] Id.

[25] Aplts' Br. at 24. See also Am. for Reversal Br. at 30 ("It is difficult to conceive of a situation that would more clearly call for the application of *expressio unius*. This Court
- 27 -

We disagree. The persuasive evidence from IGRA's legislative history seriously undermines the government's rather bald *expressio unius* argument. Recall the statement in the key committee report that "[i]t is the Committee's intent that with the passage of this act, no other Federal Statute, such as [the Johnson Act] will preclude the use of otherwise legal devices used solely in aid of or in conjunction with bingo or lotto or other such gaming on . . . Indian lands." Committee Report, 1988 U.S.C.C.A.N. at 3082. Reliance on the *expressio unius* canon is unwarranted in such a situation. Because the canon's purpose is to resolve a question not answered by the statute, the canon is not particularly useful where legislative history clearly evinces congressional intent, especially in this context of construing statutes governing Native American affairs.[26]

Second, argues the government, to adopt the appellees' construction of the two statutes, we must first find an implied partial repeal of the Johnson Act by IGRA, a construction of statutes disfavored unless there is "some affirmative showing of [congressional] intention to repeal."[27] The government argues that our language in Citizens Band Potawatoma Indian Tribe of Oklahoma v. Green,

---

must presume that Congress did not intend to exempt Class II gambling from the strictures of the Johnson Act.").

[26] See NLRB v. Pueblo of San Juan, 276 F.3d 1186, 1196 (10th Cir. 2002) (en banc) ("While [expressio unius] may find application in other types of cases, in matters of Indian law expressio unius must often be set aside.") (internal citations and quotations omitted); Martini v. Fed. Nat'l Mortgage Ass'n, 178 F.3d 1336, 1342-43 (D.C. Cir. 1999) ("A non-binding rule of statutory interpretation, not a binding rule of law, the *expressio unius* maxim is often misused. . . . the *expressio unius* maxim, unsupported by arguments based on the statute's structure or legislative history is simply too thin a reed to support the conclusion that Congress has clearly resolved the issue.") (italics supplied); cf. TRW, Inc. v. Andrews, 534 U.S. 19, 28 (2001) ("Where Congress explicitly enumerates certain exceptions to a general prohibition, additional exceptions are not to be implied, *in the absence of evidence of a contrary legislative intent*.") (internal quotation marks omitted).

[27] Aplts' Br. at 28 (quoting Morton v. Mancari, 417 U.S. 535, 550 (1974)).

995 F.2d 179 (10th Cir. 1993) – that the "IGRA provides for limited waiver of Johnson Act in certain circumstances," id. at 181, forecloses the appellees' argument that Class II aids are shielded from Johnson Act liability. Again, we disagree: our task, as we have explained, is to read the Johnson Act and IGRA together giving each Congress's enacted text the greatest continuing effect.

Accordingly, consistent with our holding in MegaMania, we hold that *if* a piece of equipment is a technologic aid to an IGRA Class II game, its use, sale, possession or transportation within Indian country is then necessarily not proscribed as a gambling device under the Johnson Act. If a piece of equipment is an IGRA Class II technologic aid, a court need not assess whether, independently of IGRA, that piece of equipment is a "gambling device" proscribed by the Johnson Act. Our holding sharpens the issues in this dispute: we now analyze whether the Machine is indeed a Class II technologic aid.

## B.      Whether the Machine is an IGRA Class II Technologic Aid

The government and supporting amici advance two arguments as to why the Machine is not an IGRA Class II technologic aid: that (1) IGRA's authorization of "technologic aids" does not extend to pull-tabs, and that (2) even if it does, the Machine is not a Class II technologic aid but, rather, an unauthorized Class III electronic facsimile of a slot machine. We take each argument in turn.

### 1.      Does IGRA's authorization of Class II "technologic aids" extend to pull-tabs?

We first detail the NIGC's construction of IGRA in its recently revised regulations of IGRA, which would extend Class II protection to technologic aids

- 29 -

to pull-tabs. We then explain why that definition is controlling in this case.


        a.      The NIGC Regulations Extending Class II Protection for "technologic aids" to Pull-Tabs

The government's argument that IGRA does not authorize technologic aids for pull-tabs is directly contrary to the NIGC's most recent amendments to the Code of Federal Regulations. On July 17, 2002, the NIGC issued revised regulations stating that "pull tab dispensers and/or readers" are among the games included as IGRA Class II "electronic, computer, or other technologic aids." 25 C.F.R. § 502.7(a), (c). These revised regulations are applicable because rather than being newly promulgated regulations, they are merely amendments, and do not operate retroactively since they do not "attach new legal consequences to events completed before enactment." Landgraf v. USI Film Prods., 511 U.S. 244, 270 (1994).

The government has conceded that the Machine is "an electromechanical dispenser and reader of paper pull-tabs." Aplts' Br. at 3. Thus, if we adopt the NIGC's construction of IGRA, we need only decide whether the Machine constitutes an "electronic, computer, or other technologic aid[]" to pull-tabs. Unless the government can show why we should not defer to the NIGC's construction of 25 U.S.C. § 2703, appellees prevail on this point. As detailed below, we conclude that the NIGC's construction is entitled to deference.


       b.    Chevron Deference

In Chevron, U.S.A., Inc. v. Natural Resources Defense Council, Inc., 467 U.S. 837, 844 (1984), the Supreme Court reaffirmed that

considerable weight should be accorded to an executive department's construction of a statutory scheme it is entrusted to administer, and the principles of deference to administrative interpretations . . . consistently followed . . . whenever decision as to the meaning or reach of a statute [] involve[s] reconciling conflicting policies, and a full understanding of the force of the statutory policy in the given situation [] depend[s] upon more than ordinary knowledge respecting the matters subjected to agency regulations.

Underlying this judicial deference to administrative agencies is the notion that the "rule-making process bears some resemblance to the legislative process and serves to temper the resultant rules such that they are likely to withstand vigorous scrutiny."[28]

With regard to classifying devices under IGRA, the NIGC's specialization warrants such deference. As the D.C. Circuit has noted, "Congress created the NIGC, headed by a Chair appointed by the President and confirmed by the Senate presumably for his or her expertise on Indian gaming." Diamond Game, 230 F.3d at 369. Congress intended that the NIGC would resolve difficult policy questions such as how to further the "objective of allowing Indian tribes to use gaming as a means of 'promoting tribal economic development, self-sufficiency, and strong tribal governments,'" id. at 368 (quoting 25 U.S.C. §§ 2701-02) (alterations in original), while at the same time "'shield[ing] [tribes] from organized crime and other corrupting influences,'" id., and from the "risk of corruption or excessive gambling losses." 230 F.3d at 368. Indeed, our circuit has held that we "afford the regulations promulgated by the [NIGC] and published in the Code of Federal Regulations the deference prescribed in Chevron." MegaMania, 231 F.3d at 718

---

[28] Atchison, Topeka and Santa Fe Ry. Co. v. Pena, 44 F.3d 437, 442 (7th Cir. 1994) (en banc).

(citing <u>Chevron</u>, 467 U.S. at 842-43).

In reviewing the NIGC's interpretation of IGRA under <u>Chevron</u>, we ask two questions:

> First, always, is the question whether Congress has directly spoken to the precise question at issue. If the intent of Congress is clear, that is the end of the matter; for the court, as well as the agency, must give effect to the unambiguously expressed intent of Congress [<u>Chevron</u> step 1]. But if the statute is silent or ambiguous with respect to the specific issue, the question for the court is whether the agency's answer is based on a permissible construction of the statute. If Congress has explicitly or implicitly delegated authority to an agency, legislative regulations are given controlling weight unless they are arbitrary, capricious, or manifestly contrary to the statute [<u>Chevron</u> step 2].

<u>MegaMania</u>, 231 F.3d at 718 (quoting <u>Maier v. EPA</u>, 114 F.3d 1032, 1040 (10th Cir. 1997) (in turn quoting <u>Chevron</u>, 467 U.S. at 842-44)) (quotation marks and citations omitted) (bracketed parentheticals supplied). Accordingly, we proceed to apply <u>Chevron</u>'s two-step analytic framework.

<u>Chevron Step One</u>

To determine "whether Congress has directly spoken to the precise question at issue," <u>id.</u>, i.e., whether IGRA authorizes the use of technologic aids to pull-tabs, we employ "traditional tools of statutory construction." <u>Arco Oil & Gas Co. v. EPA</u>, 14 F.3d 1431, 1436 (10th Cir. 1993) (internal quotation marks omitted). We turn to <u>Chevron</u>'s second step only if "nothing in the statute directs" a clear answer. <u>Public Lands Council v. Babbitt</u>, 167 F.3d 1287, 1302 (10th Cir. 1999) (en banc).

We begin with the statutory text. IGRA defines "Class II gaming" as:

(i) the game of chance commonly known as bingo (whether or not electronic, computer, or other technologic aids are used in connection therewith)--

(I) which is played for prizes, including monetary prizes, with cards bearing numbers or other designations,
(II) in which the holder of the card covers such numbers or designations when objects, similarly numbered or designated, are drawn or electronically determined, and
(III) in which the game is won by the first person covering a previously designated arrangement of numbers or designations on such cards, including (if played in the same location) pull-tabs, lotto, punch boards, tip jars, instant bingo, and other games similar to bingo . . . .

25 U.S.C. § 2703(7)(A). Whether the authorization of the use of technologic aids extends to pull-tabs is not clearly resolved by the text of § 2703(7)(A)(i), which leaves ambiguous whether "technologic aids" parenthetical refers only to bingo, or also refers to the other games of chance authorized as Class II gaming in subsection (i)(III). There is no mention in any of the seven merits briefs filed in this appeal of, nor have we discovered, any legislative history pre-dating IGRA that speaks directly to the permissibility of Class II technologic aids for games other than bingo, or, for that matter, to the classification of pull-tab aids or dispensers in general. Moreover, application of traditional canons of statutory construction leaves us in equipoise.

For example, on the one hand, "[t]he doctrine of *ejusdem generis* provides that when there are general words following particular and specific words, the former [are] confined to things of the same kind."[29] Accordingly, the authorization in subsection (7)(A)(I) of the use of aids for bingo could be

---

[29] United States v. Bedonie, 913 F.2d 782, 790 n.7 (10th Cir. 1991) (internal quotation marks omitted and italics supplied). See also Norfolk & Western Ry. Co. v. Am. Train Dispatchers Ass'n, 499 U.S. 117, 129 (1991) (applying the *ejusdem generis* canon).

reasonably read as authorizing the use of technologic aids for all Class II bingo and bingo-like gaming authorized in that subsection.

On the other hand, as several amici anti-gambling organizations counter, the "last antecedent rule" of statutory construction arguably points the other way. See Am. for Reversal Br. at 7-9. Under this rule of construction, "[r]eferential and qualifying words or phrases refer only to the last antecedent, unless contrary to the apparent legislative intent."[30] Because "technologic aids" is a qualifying phrase, goes the argument, this clause therefore modifies only the immediately preceding phrase ("the game of chance commonly known as bingo"), but does not modify "pull-tabs." Accordingly, because "nothing in the statute directs" a clear answer, Public Lands Council, 167 F.3d at 1302, we turn to Chevron's second step.[31]

---

[30] Eskridge, Frickey & Garrett, *supra* n.19, at 826. See also United States v. Telluride Co., 146 F.3d 1241, 1245 (10th Cir. 1998) ("The last antecedent rule [] applies modifying words or phrases to the immediately preceding word or phrase.").

[31] As we have discussed, the NIGC regulations construe the ambiguity in IGRA in favor of the position advocated by the tribes in this case. This construction is consistent with the Blackfeet canon, under which "federal statutes are to be construed liberally in favor of Native Americans, with ambiguous provisions interpreted to their benefit." Ramah Navajo Chapter v. Lujan, 112 F.3d 1455, 1461-62 (10th Cir. 1997) (citing Montana v. Blackfeet Tribe, 471 U.S. 759, 766 (1985)). Both parties in this case extensively briefed the Chevron issue, and, perhaps because the agency view points in favor of the tribes' position, no party has argued that the Blackfeet canon is implicated. In Ramah, 112 F.3d at 1461-62, this court, construing regulations promulgated by the Secretary of the Interior to implement the Indian Self-Determination and Education Assistance Act that were opposed by the tribes, stated that "for purposes of this case, [] the canon of construction favoring Native Americans controls over the more general rule of deference to agency interpretations of ambiguous statutes." See also Albuquerque Indian Rights v. Lujan, 930 F.2d 49, 59 (D.C. Cir. 1991) (rejecting the proposition that Chevron deference trumps the Blackfeet canon). Subsequently, in MegaMania, this court cited the Blackfeet canon with approval, see 231 F.3d at 718, but proceeded to resolve the question in favor of the tribes based in part upon Chevron deference. See id. at 720-25; cf. Shakopee Mdewakanton Sioux Community v. Hope, 16 F.3d 261, 264 (8th Cir. 1994) ("[T]he Commission has satisfied the requirement that statutes be interpreted in favor of the Indian Tribes.") (internal citations and quotation marks omitted). But cf. Williams v. Babbitt, 115 F.3d

<u>Chevron Step Two</u>

This step requires that we determine whether the NIGC's regulation stating that "pull tab dispensers and/or readers" are IGRA Class II "electronic, computer or other technologic aids," 25 C.F.R. § 502.7, is a "permissible construction of the statute," <u>Maier</u>, 114 F.3d at 1040 (quoting <u>Chevron</u>, 467 U.S. at 842-43), or, instead, is "arbitrary, capricious, or manifestly contrary to the statute." <u>Id.</u>

At least six factors support the reasonableness of the NIGC's construction as consistent with IGRA. First, the regulation represents a plausible reading of 25 U.S.C. § 2703(7)(A)(I)'s text. Second, as discussed above, the *ejusdem generis* canon supports such a construction. Third, the NIGC's relatively inclusive reading of § 2703 has some support in IGRA's legislative history.[32] Fourth, the NIGC's construction is not an unreasonable choice in the sense that the NIGC has adopted the reading of an ambiguous statute that is ostensibly more likely to expand the pool of tribal revenue through greater gaming variety and offerings.[33]

---

657, 663 n.5 (9th Cir. 1997) (deferring to the Secretary of Interior's regulations of the Reindeer Industry Act under <u>Chevron</u> notwithstanding that the <u>Blackfeet</u> canon cut the other way). In any event, the <u>Blackfeet</u> canon supports our conclusion, and we need not further address the issue.

[32] <u>See</u> Committee Report, 1988 U.S.C.C.A.N. at 3079 ("The Committee specifically rejects any inference that tribes should restrict [C]lass II games to existing game sizes, levels of participation, or current technology. The Committee intends that tribes be given the opportunity to take advantage of modern methods of conducting Class II games and *the language regarding technology is designed to provide maximum flexibility.")* (emphasis supplied).

[33] <u>See</u> 25 U.S.C. § 2702 (stating that one of the purposes of IGRA was "to meet congressional concerns regarding gaming and to protect such gaming as a means of generating tribal revenue"); <u>see also, e.g.</u>, Kathryn R. L. Rand, <u>There Are No Pequots on the Plains: Assessing the Success of Indian Gaming</u>, 5 Chap. L. Rev. 47, 53 (2002) (surveying recent studies of tribal economic trends, and noting "marked improvements for many Native American communities, largely due to gaming revenue"). <u>But cf, e.g.</u>, Richard J. Ansson, Jr. & Ladine Oravetz, <u>Tribal Economic Development: What Challenges Lie Ahead for Tribal Nations as They Continue to Strive for Economic Diversity?</u>, 11 Kan. J. L. & Pub. Pol. 441, 441 (2002) ("[F]or most tribes, these corporate

Fifth, the NIGC may also wish to interpret ambiguities in IGRA so as to narrow its demanding oversight mandate.[34] Finally, perhaps the best evidence of the reasonableness of the NIGC's construction is the favorable reception it has already received in the federal courts.[35]

For these reasons, we hold that the NIGC's determination in 25 C.F.R. § 507.2 that IGRA authorizes Class II technologic aids for pull-tabs is a "permissible construction of the statute," and we therefore accord it "controlling weight." MegaMania, 231 F.3d at 718 (quoting Chevron, 467 U.S. at 842-43).

### 2. Is the Machine a Class II Technologic Aid?

As noted above, IGRA defines Class II games to include "bingo (whether

---

business ventures' profits . . . in the gaming [] industry[] have been marginal"); Frank R. Wolf, United States Representative, Press Release, Wolf Measure Would Allow State Legislatures to Have Voice in Creation of Gambling Operation on Indian Reservations (June 19, 2001), at <www.house.gov/wolf/2001619wolfindianleg.htm> ("Nearly 80 percent of Native Americans don't receive anything from gambling revenues. . . . Most tribes, living in areas that are not economically viable for a casino, continue to live in awful poverty, plagued by disease, infant mortality, unemployment and a lack of educational opportunities.").

[34] See, e.g., Statement of Harold A. Monteau, Chairman, NIGC, The Indian Gaming Regulatory Act Amendments Acts of 1995: Hearings on S. 487 Before the Senate Appropriations Subcommittee on Interior and Related Agencies, 104th Cong., 1st Sess. 248 (1995), 1995 WL 293541 (urging that fulfillment of the NIGC obligations cannot be met within the statutory limitation on appropriations and assessments for the NIGC); Michael D. Cox, The Indian Gaming Regulatory Act: An Overview, 7 St. Thomas L. Rev. 769, 770 (1995) (commenting that "[t]he NIGC, charged with monitoring over 210 gaming operations . . . is underfunded and understaffed").

[35] See, e.g., Diamond Game, 230 F.3d at 367 ("[T]he Act allows the use of 'electronic, computer, or other technologic aids' in connection with Class II games.") (quoting 25 U.S.C. § 2703(7)(A)(i)); Cabazon Band of Mission Indians v. National Indian Gaming Comm'n, 827 F. Supp. 26, 31 (D.D.C. 1993) (noting that § 2703(7)(A) authorizes "the use of 'aids' for certain Class II games" (emphasis supplied), aff'd, 14 F.3d 633 (D.C. Cir. 1994). But see Santee Sioux Tribe of Nebraska, 2003 WL 1339280, at *5 (stating in dicta that "we believe that the phrase 'whether or not electronic, computer, or other technologic aids are used in connection therewith' applies only to bingo").

or not electronic, computer or other technologic aids are *used in connection therewith*) . . . including (if played in the same location) pull-tabs . . . and other games similar to bingo . . . 25 U.S.C. § 2703(7)(A) (emphasis supplied). The government does not dispute that the game played with the Machine was, or would have been, played in the same location as bingo. Rather, the government's two arguments are that (1) the game played with the Machine is not pull-tabs, but, rather, an electromechanical facsimile version of slots; and (2) that the Machine does not fall within IGRA's definition of an "aid." As detailed below, we reject these arguments and hold the Machine is a Class II technologic aid to the game of pull-tabs.

A.      The Machine is Used "in connection" with pull-tabs

Contrary to the government's assertion, the game played with the Machine falls within the definition of pull-tabs. IGRA does not define pull-tabs. Nor do the NIGC's regulations.[36] This court, though, has provided a definition. In Chickasaw Nation v. United States, 208 F.3d 871 (10th Cir. 2000), aff'd, 534 U.S. 84 (2001), we stated that pull-tabs is a "scheme by which prizes are randomly distributed to the winners among the persons who have paid for a chance to win them, i.e. by purchasing one or more pull-tab tickets in a series." Id. at 877. We noted that in pull-tabs, after players purchase a tab from a clerk or from the given dispensing machine, they must peel back the top layer to determine whether the tab contains a winning combination of symbols, and that if players purchase a

---

[36] See Definitions Under the Indian Gaming Act, 57 Fed. Reg. 12,382-83 (April 9, 1992) (providing no definition and stating that the NIGC will rely on the common law definition of pull-tabs).

winning tab, they must present it to the cashier.  See id. at 874.

The Machine meets this definition.  It dispenses paper pull-tabs from a roll that is part of a larger deal, and the deal contains a predetermined number of randomly distributed winning tabs.  Although a pull-tabs player may opt to view the video display regarding the contents of the paper pull-tabs, players of the Machine must still manually peel back the top layer of the pull-tab to confirm victory, and it is that tab presented for visual inspection to a gaming hall clerk that entitles players to winnings.  We thus reject the argument that the game played with the Machine is slots: although we acknowledge some superficial similarities between the two, pull-tabs, even when sped up, placed under lights, and depicted with a spinning machine on the side, is still pull-tabs.  We hold that the Machine is used in connection with the playing of pull-tabs.

B. Whether the Machine is an Aid to the Game of Pull-Tabs

We first detail the NIGC's definition of "aid", and then explain why we accord it controlling weight.  Finally, we explain why the Machine meets that definition.

i. The Definition by the NIGC's Regulations of "Aid"

IGRA does not define " technologic aids."  The NIGC, however, recently issued regulations, which state

    (a)    Electronic, computer or other technologic aid means any machine or device that:

        (1)    Assists a player or the playing of a game;
        (2)    Is not an electronic or electromechanical facsimile; and

(3)    Is operated in accordance with applicable Federal communications law.

(b)    Electronic, computer or other technologic aids include, but are not limited to, machines, or devices that:

(1)    Broaden the participation levels in a common game;
(2)    Facilitate communication between and among gaming sites;
(3)    Allow a player to play with or against other players rather than with or against a machine.

(c)    Examples of electronic, computer or other technologic aids include pull tab dispensers and/or readers, telephones, cables, televisions, screens, satellites, bingo blowers, electronic player stations, or electronic cards for participants in bingo games.

25 C.F.R. § 502.7.

ii. The NIGC's Definition in 25 C.F.R. § 502.7 is Controlling

The government does not dispute that the three requirements identified in 25 C.F.R. § 502.7(a) must be met for a device to qualify as a Class II technologic aid; rather, the government argues that we should impose an additional requirement. According to the government, the Machine is not a Class II technologic aid because Class II aids must "broaden participation" in the games. See Committee Report, 1988 U.S.C.C.A.N. at 3079 (stating that use of an aid that "would merely broaden the participation levels is readily distinguishable from the use of electronic facsimiles in which a single participant plays a game with or against a machine rather than with or against other players"). The government argues that in MegaMania, we endorsed the "broaden participation" requirement, Aplts' Reply Br. at 13, and also points to the Ninth Circuit's statement that "the passage from the Committee report also reinforces the notion that electronic aids are essentially aimed at communications to enable broader participation in a

- 39 -

common game."[37]

For several reasons, we are unpersuaded that the "broaden participation" requirement suggested by the government should be grafted onto IGRA. First, we reject the government's characterization of our holding in MegaMania. In MegaMania, we held that the device at issue was a technologic aid *in part* because it broadened participation in the underlying game of bingo. See 231 F.3d at 724-25 (identifying the broadening of participation as one of at least four reasons supporting the holding). We did not hold that broadening participation was a requirement, nor did we endorse any such categorical rule. Rather, like the subsequently published NIGC regulations, we identified the broadening of participation as a factor favoring a finding that a device is a Class II aid.

Second, we conclude that the NIGC's definition of "aid," which does not include the "broaden participation" requirement, is entitled to full Chevron deference. Applying Chevron's first step, nothing in either IGRA's text or legislative history points towards a *requirement* that a technologic aid broaden participation. Indeed, the Committee Report uses the term "for example" to describe how a device might qualify as a Class II aid by broadening participation in the given game. Committee Report, 1988 U.S.C.C.A.N. at 3079. And the NIGC's regulation closely tracks the legislative history, stating that "[e]lectronic, computer or other technologic aids include, but *are not limited to*, machines or devices." 25 C.F.R. § 502.7(b) (emphasis supplied). Moreover, adopting the government's strict proposed definition of "aid" would run counter to the Committee Report's exhortation that "tribes be given the opportunity to take

---

[37] Sycuan Band of Missions Indians v. Roache, 54 F.3d 535, 543-44 (9th Cir. 1995).

advantage of modern methods of conducting Class II games and the language regarding technology is designed to provide maximum flexibility." 1988 U.S.C.C.A.N. at 3079. Accordingly, we adopt the standard articulated by the NIGC's regulation, and express no opinion concerning whether the Machine broadens participation in the playing of pull-tabs.

As to <u>Chevron</u>'s second step, we conclude that the NIGC's regulation is based on a permissible construction of IGRA. As noted, the NIGC's regulations provides a three-part test for determining whether a machine or device is a Class II aid, requiring that the device

(1) Assists a player or the playing of a game;
(2) Is not an electronic or electromechanical facsimile; and
(3) Is operated in accordance with applicable Federal communications law.

25 C.F.R. § 502.7.

In <u>Diamond Game</u>, Judge Tatel's unanimous panel opinion concluded that the Lucky Tab II functions as an aid to the game of pull-tabs because the Lucky Tab II is not an electromechanical facsimile, and because the Lucky Tab II literally "helps or supports" or "assists" the playing of pull-tabs.[38] The opinion emphasized that Lucky Tab II physically cuts tabs from paper rolls and dispenses them to players, and merely displays the contents of the paper tab on its video screen for view by players, who must still peel and display any winning tabs to a clerk to obtain a prize. <u>See</u> 230 F.3d at 270. Concluding that the Lucky Tab is "little more than a high-tech dealer," and that the pull-tabs game with the Lucky Tab II is in the paper rolls, not the device, <u>id</u>., the D.C. Circuit held that the

---

[38] <u>Diamond Game</u>, 230 F.3d at 270 (quoting <u>Webster's Third New International Dictionary</u> 44 (1993)).

Lucky Tab II is a Class II technologic aid. See id. We are persuaded that the D.C. Circuit's interpretation of "aid" as the term is used in IGRA is correct.

The government would have us distinguish Diamond Game on two grounds. First, argues the government, Diamond Game is distinguishable because in that case, the NIGC never issued an advisory classification on Lucky Tab II, as it did with the Machine in this case. See Aplts' Br. at 38. It is true that an administrative agency's opinion letter is "entitled to respect." MegaMania, 231 F.3d at 719 (citing Skidmore v. Swift & Co., 323 U.S. 134, 140 (1944)). However, an agency's opinion letter is not binding, nor, unlike an NIGC regulation enacted pursuant to the rigors of the Administrative Procedure Act, is it entitled to any deference. Instead, the NIGC's opinion letter is at most persuasive authority; it is entitled only to that weight that its power to persuade compels. See 231 F.3d at 719. Significantly, the NIGC's opinion letter regarding the Machine was predicated on a district court opinion that was subsequently reversed by the D.C. Circuit.[39] The reversal of that opinion in a persuasively reasoned decision by the D.C. Circuit confirms that the NIGC letter lacks much persuasive force here.

Second, argues the government, Diamond Game is distinguishable because the D.C. Circuit did not address whether the Lucky Tab II was a Johnson Act "gambling device." Aplts' Br. at 38. However, whether the D.C. Circuit completed the IGRA-Johnson Act syllogism is immaterial to our IGRA classification analysis. Accordingly, we reject the government's attempts to

---

[39] See Aplts' App. at 9 (Letter from NIGC General Counsel Kevin Washburn dated Feb. 29, 2000) (stating that "Lucky Tab closely parallels [the Machine] and that "the [district] court opinion in [Diamond Game] provides clear guidance to determine the classification for the Magic Irish").

distinguish Diamond Game. The NIGC's regulations' straightforward construction of "technologic aid," in essence adopting the D.C. Circuit's standard, is at least a permissible construction of the statute; indeed, were we required to reach the question on a blank slate, we might well adopt that standard. We therefore accord the NIGC's definition of "technologic aid" controlling weight. See MegaMania, 231 F.3d at 718.

iii. The Machine Meets the Controlling NIGC's Definition of Aid

Because the NIGC's definition controls, the Machine is a Class II aid if it "(1) [a]ssists a player or the playing of a game; (2) [i]s not an electronic or electromechanical facsimile; and (3) [i]s operated in accordance with applicable Federal communications law." 25 C.F.R. § 502.7. With its last gasp, the government contends that the Machine fails the second and third of these requirements.

We disagree. Like the Lucky Tab II, the Machine (1) cuts tabs from paper rolls and dispenses them to players, and when its "verify" feature is enabled, displays the contents of the paper pull-tab on the video screen; (2) does not use a computer to select the patterns of the pull-tabs it dispenses; and (3) requires players to peel each pull-tab to confirm the result and provide the pull-tab to a clerk for inspection prior to receiving any prize. As with the Lucky Tab II, with the Machine, the Machine is not the game of pull-tabs; rather, the Machine facilitates the playing of pull-tabs, "the game is in the paper rolls." Diamond Game, 230 F.3d at 269-70. As such, the Machine is not a "computerized version" of pull-tabs. See id.; see also Santee Sioux Tribe of Neb., 2003 WL 1339280, at *7 (in holding that the Lucky Tab device at issue was not a computerized version

- 43 -

of pull-tabs, emphasizing "the fundamental fact that the player receives a traditional paper pull-tab from a machine, and whether he or she decides to pull the tab or not, must present that card to the cashier to redeem winnings."). Nor, put in terms of the NIGC's regulations implementing IGRA, is the Machine an "electronic or electromechanical facsimile." 25 C.F.R. § 502.7. Thus, contrary to the government's suggestion, the Machine does not "change[] the fundamental characteristics" of pull-tabs as played by the user. Aplts' Br. at 33 (citing Committee Report, 1988 U.S.C.C.A.N. at 3079).

Accordingly, we follow the reasoning of the D.C. Circuit, and, applying the NIGC's definition, hold that the Machine is a Class II technologic aid. Under our holding in Part IV(A), the appellees' use of the Machine in Indian country is therefore insulated from liability based on the Johnson Act's ban on gambling devices.

## CONCLUSION

For the reasons detailed above, we **AFFIRM** the district court's declaratory judgment that the Machine is (1) not an illegal "gambling device" under the Johnson Act and (2) a permissible technologic aid to Class II gaming under IGRA.[40]

---

[40] In addition, appellees' motions to dismiss the appeal as moot and to file supplemental briefing are denied.